Brad M. Johnston, Esq.
Nevada Bar No. 8515
SIMONS HALL JOHNSTON PC
22 State Route 208
Yerington, Nevada 89447
Telephone: 775.463.9500
Email: bjohnston@shjnevada.com

Elizabeth Fletcher, Esq.
Nevada Bar No. 10082
FLETCHER & LEE
448 Ridge Street
Reno, Nevada 89501
Telephone: 775.324.1011
Email: efletcher@fletcherlawgroup.com

Attorneys for Steven J. Yang,
Trustee of the SJY Living Trust
dated March 24, 2020 and
the Internal Note Group[1]

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

| In re:<br>GUARDIAN FUND, LLC,<br><br>☒ Affects this Debtor<br>☐ Affects Guardian CV1, LLC<br>☐ Affects Guardian CV2, LLC<br>☐ Affects All Debtors<br><br>　　　　Debtors. | Case No.: 23-50177-hlb<br>Case No.: 23-50233-hlb<br>**Consolidated Case No.: 23-50177-hlb**<br><br>Chapter 11 Case<br><br>Jointly Administered with: |
|---|---|

| 23-50951-hlb | Guardian CV1, LLC |
|---|---|
| 23-50952-hlb | Guardian CV2, LLC |

---

[1] Simons Hall Johnston PC and Fletcher & Lee, Ltd. represent the following victims of Guardian Fund's Ponzi scheme in the Adversary Proceedings that Guardian has filed to, in part, collect on the promissory notes that Guardian procured through its fraudulent business (collectively, the "Note Adversaries"): Kristy Lee Crabtree, Trustee of the Kristy Lee Crabtree Trust and Andrew Perwein, Trustee of the Andrew L. Perwein Trust, as members of Crazy Deer Properties LLC, Series 2 (Adv. Pro. No. 25-05044-hlb); Cody Edwards, as Trustee of The Edwards Living Trust and CTMC Acres, LLC (Adv. Pro. No. 25-05064-hlb); Bradley H. Johnson and Reid Johnson (Adv. Pro. No. 25-05043-hlb); Steven J. Yang, Trustee of the SJY Living Trust dated March 24, 2020 (Adv. Pro. No. 25-05036-hlb); Laura Segert, Paul Segert and Jo Ann Segert (Adv. Pro. No. 25-05059-hlb); Mark B. Hughes and Kris A. Hughes, Trustees of the MKH Trust I (Adv. Pro. No. 25-05050-hlb);  Jim L. Shepperd (Adv. Pro. No. 25-05051-hlb); and Nick Epper aka Nickolas Epper (Adv. Pro. No. 25-05054-hlb) (collectively, Defendants are the "Internal Note Group").

| GUARDIAN FUND, LLC, a Nevada limited liability company,<br><br>          Plaintiff,<br><br>v.<br><br>STEVE J. YANG, as Trustee of THE SJY LIVING TRUST DATED MARCH 24, 2020,<br><br>          Defendants. | **Adversary No.: 25-05036-hlb**<br><br>**DEFENDANT'S (1) MOTION TO DISMISS FIRST AMENDED ADVERSARY COMPLAINT; OR, IN THE ALTERNATIVE, (2) MOTION TO STAY ADVERSARY PROCEEDING**<br><br>**Hearing Date:  April 24, 2026**<br>**Hearing Time: 1:30 p.m.** |

**TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................... 1

II.    RELEVANT FACTUAL BACKGROUND............................................... 3

    A.  The Hughes Adversary Proceeding ............................................ 5

    B.  The Pino Adversary Proceeding ................................................. 6

    C.  The Present Adversary Proceeding............................................. 11

III.   LEGAL AUTHORITY AND DISCUSSION ........................................ 12

    A.  Motion to Dismiss For Failure To State A Claim........................ 12

        1.  Legal Standards ................................................................ 12

            a.  Dismissal Pursuant to Fed. R. Civ. Pro 12)b)(6) ...................... 12

            b.  Legal Standards for Application of Judicial Estoppel .............. 13

        2.  Discussion and Analysis  ................................................... 14

            a.  Guardian Has Admitted It Was A Ponzi Scheme  ................... 14

            b.  The Fraudulent Conduct By Guardian's Corporate Agent Must Be Imputed To Guardian  ................................................. 16

            c.  Given Its Multiple Admissions of Fraud By Its Corporate Agents, Guardian Should Be Judicially Estopped From Benefiting From Its Own Fraud ............................................... 17

                1)  Guardian's Admission In The Hughes Complaint Are Clearly Inconsistent with Enforcement Of the Promissory Notes, Unjust Enrichment Claims And Guardian's Other Claims ........................................... 17

                2)  Guardian's Admission In The Hughes Complain Should Be Accepted As True For Estoppel Purposes Given That Guardian Filed The Hughes Complaint Pursuant To The Bankruptcy Code and Rules, Including Fed. R. Bankr. Pro. 9011  .................................. 20

                3)  Allowing Guardian To Enforce The Promissory Notes, Argue Unjust Enrichment And Disallow Investor Claims Would Allow Guardian An Unfair Advantage and Impose An Unfair Detriment On Investors ................................... 22

3.  Conclusion  ................................................................................................ 23

B.  Motion to Stay Adversary Proceeding  ....................................................... 24

IV.      CONCLUSION  ......................................................................................................... 26

### TABLE OF AUTHORITIES

**Cases**                                                                                              **Page(s)**

*Acute Inc. v. ECI Pharms. LLC (In re ECI Pharms. LLC)*,
        669 B.R. 617, 619 (Bankr. S.D. Fla. 2025) ..................................................................24

*Allen v. Partington*,
        No. LACV 20-06793-VAP (JEMx),
        2020 U.S. Dist. LEXIS 189515, at *5 (C.D. Cal. Oct. 9, 2020) ...............................14

*Asarco, LLC v. Union Pac. R.R. Co.*,
        765 F.3d 999, 1004 (9th Cir. 2014) ..........................................................................14

*Ashcroft v. Iqbal*,
        556 U.S. 662, 678 (2009) ..........................................................................................12

*Bell Atlantic Corp. v. Twombly*,
        550 U.S. 554, 570 (2007) ..........................................................................................13

*Boquist v. Courtney*,
        32 F.4th 764, 774 (9th Cir. 2022) .............................................................................18

*Caldwell v. Nordic Naturals, Inc.*,
        709 F. Supp. 3d 889, 912 (N.D. Cal. 2024) .............................................................. 24

*Cannata v. Wyndham Worldwide Corp.*,
        798 F. Supp. 2d 1165, 1171 (D. Nev. 2011) .............................................................13

*Cohen v. Bucci*,
        905 F.2d 1111, 1112 (7th Cir. 1990) .........................................................................21

*In re: Crowe*,
        Nos. Chapter 11 Proceeding 4:19-bk-04406-BMW,
        4:19-ap-00260-BMW, 2020 Bankr. LEXIS 475, at *12
        (Bankr. D. Ariz. Feb. 20, 2020) …………………………………………………….24

*Davies v. Deutsche Bank Nat'l Tr. Co., (In re Davies)*,
        No. CC-11-1221-MkHPa, 2012 Bankr. LEXIS 393,
        at *18-19 (B.A.P. 9th Cir. Jan. 12, 2012) .................................................................12

*In re Del Mission Ltd.*,
        98 F.3d 1147, 1153 (9th Cir. 1996) ...........................................................................24

*Ernest Bock, LLC v. Steelman*,
        76 F.4th 827, 842 (9th Cir. 2023) ..............................................................................25

*Ex Parte Rickey*,
     31 Nev. 82, 88 (1909) ......................................................................................................23

*In re Guardian Fund, LLC*,
     Case No. 23-50177-hlb (Bankr. NV 2023) ................................................................1

*Guardian Fund, LLC, et al. v. Greg Hughes, et al.*,
*(In re Guardian Fund, LLC)*
     Adv. Pro. No. 25-05014-hlb (Bankr. NV Adv. Pro. 2025) .......................................1

*Guardian Fund, LLC v. Laurence J. Pino and Pino Law Group PLLC*,
*(In re Guardian Fund, LLC)*
     Adv. Pro. No. 25-05015-hlb (Bankr. NV Adv. Pro. 2025).......................................1

*In re Hughes Private Capital, Inc.*,
     Case No. 23-50322-hlb (Bankr. NV 2023) ...............................................................1

*Hamilton v. State Farm Fire & Cas. Co.*,
     270 F.3d 778, 782 (9th Cir. 2001) ....................................................................13, 14

*Intri-Plex Techs., Inc. v. Crest Grp., Inc.*,
     499 F.3d 1048, 1056 (9th Cir. 2007) ......................................................................13

*Jones v. Bock*,
     549 U.S. 199, 215 (2007) ........................................................................................12

*Kirkland v. Rund (In re EPD Inv. Co., LLC)*,
     114 F.4th 1148, 1156-57 (9th Cir. 2024) .................................................................15

*Landis v. N. Am. Co.*,
     299 U.S. 248, 255 (1936) ........................................................................................30

*McAdams v. Nationstar Mortg. LLC*,
     No. 3:20-cv-2202-L-BLM, 2022
     U.S. Dist. LEXIS 153677, at *8 (S.D. Cal. Aug. 24, 2022) ....................................14

*Naviscent, LLC v. Otte, (In re Martinez)*,
     610 B.R. 290, 296 (Bankr. N.D. Cal. 2019) ...........................................................21

*New Hampshire v. Maine*,
     532 U.S. 742, 750-51 (2001) .............................................................................14, 22

*Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP*,
     133 Cal. App. 4th 658, 681-82, 35 Cal. Rptr. 3d 31 (2005) ....................................16

*In re Pilgrim's Pride Corp.*,
     442 B.R. 522, 530 (Bankr. N.D. Tex. 2010)............................................................21

*Pub. Emps. Ret. Ass'n of N.M. v. Earley (In re PG&E Corp. Sec. Litig.),*
    100 F.4th 1076, 1085 (9th Cir. 2024) ........................................25

*Richman v. FWB Bank,*
    122 Md. App. 110, 153-55, 712 A.2d 41, 62-63 (1998) ...........................................21

*Rissetto v. Plumbers & Steamfitters, Local 343,*
    94 F.3d 597, 600-601 (9th Cir. 1996) .......................................13

*Russell v. Rolfs,*
    893 F.2d 1033, 1037 (9th Cir. 1990) .......................................13

*In re Stac Electronics Sec. Litig.,*
    89 F.3d 1399, 1043 (9th Cir. 1996) .......................................12

*Stoll v. Hartford,*
    No. 05CV1907 IEG (LSP), 2006 U.S. Dist.
    LEXIS 81781, at *34 (S.D. Cal. Nov. 7, 2006) .......................................13

*Uecker v. Wells Fargo Capital Fin., LLC (In re Mortg. Fund '08 LLC)*
    527 B.R. 351, 369 (N.D. Cal. 2015) .......................................16, 17

*United States v. Rasheed,*
    663 F.2d 843, 849 n.1 (9th Cir. 1981) .......................................14

*U.S. v. Ritchie,*
    342 F.3d 903, 908 (9th Cir. 2003) .......................................13

*Van Der Pas v. Assuravest, LLC et al,*
    Case No. 1:20-cv-00235 (W.D. Tex. 2021) .......................................1

*Viega GmbH v. Eight Judicial Dist. Court of the State,*
    130 Nev. 368, 383 (2014) .......................................23

*Weinstein v. Vaughan (In re Vaughan),*
    Case Nos. 13-14399-GS, 14-01128-GS,
    2015 Bankr. LEXIS 4570, at *34 (Bankr. D. Nev. July 13, 2015) ...........................21

*Wensley v. First Nat. Bank of Nev.,*
    874 F. Supp. 2d 957, 962 (D. Nev. 2012) .......................................12

*Winkler v. McCloskey,*
    83 F.4th 720, 723 n.1 (9th Cir. 2023) .......................................14

*Wright & Miller, Preclusion of Inconsistent Positions – Judicial Estoppel,*
    18B Fed. Prac. Proc. Juris § 4477 (Sep. 2025) .......................................22

*Wyle v. C.H. Rider & Family (In re United Energy Corp.),*

944 F.2d 589, 596 (9th Cir. 1991) .........................................................................23

**Federal Statutes and Rules**

11 U.S.C. § 105(a) ...............................................................................................1, 24, 26

11 U.S.C. § 542.........................................................................................................11, 24

26 U.S.C. § 1031(a) .........................................................................................................19

Fed. R. Bankr. Proc. 7012(b) ..........................................................................................1

Fed. R. Bankr. Proc. 7016(b)(3) ...............................................................................25, 27

Fed. R. Civ. P. 12(b)(6) ................................................................................................1, 12

Fed. R. Civ. P. 42 .............................................................................................................3

Fed. R. Evid. 201 ............................................................................................................1

Local Rule of Bankruptcy Procedure 7012 ...................................................................1

Defendant Steve J. Yang, as Trustee of the SJY Living Trust Dated March 24, 2020 ("Defendant or Yang"), by and through his undersigned counsel, Brad M. Johnston of Simons Hall Johnston PC, and Elizabeth Fletcher of Fletcher & Lee, Ltd., hereby respectfully moves this Court for (1) entry of an order dismissing this Adversary Complaint ("Yang Complaint") filed by the Guardian Fund, LLC ("Plaintiff" or "Guardian"), pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to these proceedings by Fed. R. Bank. P. 7012(b) and Local Rule of Procedure 7012, for failure to state a claim upon which relief may be granted; or, in the alternative, for an order staying this proceeding pursuant to 11 U.S.C. § 105(a) and/or this Court's inherent powers pending the outcome of two adversary proceedings currently pending before this Court entitled (1) Guardian Fund, LLC, et al. v. Greg Hughes, et al., Adv. Pro. No. 25-05014-hlb (the "Hughes Adversary"); and (2) Guardian Fund, LLC v. Laurence J. Pino and Pino Law Group PLLC, Adv. Pro. No. 25-05015-hlb (the "Pino Adversary"). Defendant hereby incorporates by reference all allegations and claims made in the Hughes and Pino Adversaries as if fully set forth herein.

This Motion is based on the following points and authorities, the attached exhibits, and the papers and pleadings on file in the present case of which the Debtor has asked the Court take judicial notice pursuant to Fed. R. Evid. 201. Defendant further requests that this Court take judicial notice pursuant to Fed. R. Evid. 201 of the papers and pleadings filed in the public record in the following cases: the Hughes Adversary; the Pino Adversary; Victoire Van Der Pas v. Assuravest, LLC and Hughes Private Capital, LLC, Case No. 1:20-CV-00235-RP, filed in the United States District Court for the Western District of Texas (the "Assuravest Litigation"); In re Guardian Fund, LLC, Case No. 23-50233-hlb, consolidated with In re Guardian Fund, LLC, in Lead Case No. 23-50177-hlb (the "Guardian Bankruptcy"); and In re Hughes Private Capital, Inc., Case No. 23-50322-hlb (the "HPC Bankruptcy").

Respectfully, Defendant does not consent to entry of final orders or judgment by this Court.

## I.    INTRODUCTION

The Guardian Fund has filed close to thirty adversary proceedings against the victims of its own fraud in an attempt to collect on promissory notes that it claims are valid and enforceable.

In filing these lawsuits, Guardian has taken the position that the promissory notes are merely receivables of the Fund and that the investors who have refused to pay the notes are bad actors who are trying to cheat Guardian and obtain a tax advantage.  This could not be farther from the truth.  Guardian itself has made very clear, in the Hughes and Pino Adversaries, that Guardian's entire operation was a colossal fraud.  In fact, while Guardian is seeking to collect the promissory notes that were procured through Guardian's fraudulent business practices, it is pursuing litigation against its founders and professionals, alleging that the overall investment scheme involving Guardian and other closely associated entities consisted of "fraud on an epic level" that harmed "all those who invested in the fraudulent scheme[,]" including Yang and the rest of the defendants in the myriad of adversary proceedings Guardian has filed.

The absolute and unabashed brazenness of those who claim to be working on behalf of the investors and members of Guardian is astonishing and shocking to the conscience.  To date, in these bankruptcy proceedings, this Court has not had before it the full story – on the merits – of the fraud perpetrated by Guardian, its associated entities and the individuals who orchestrated it.  This is not because there has not been opportunity, but strictly because nearly all of the investors who were duped into this scheme (**which the plaintiff admits and affirmatively alleges was a _fraudulent_ scheme**) consist of elderly individuals who trusted these alleged "experienced investment advisors" and invested millions of retirement dollars that will never be recovered.  The majority of investors have been, to date, unwilling to spend money litigating given the exorbitant amounts they have already lost.  Instead, the majority of investors relied on the Unsecured Creditors' Committee ("UCC") to represent their best interests. The Debtor and the UCC obtained hundreds of settlements from these unrepresented investors, many of whom did not understand the bankruptcy process or what they were giving up via settlement.

Guardian is now re-victimizing investors by admitting the scheme was fraudulent but attempting to collect on promissory notes that were procured solely through that very fraud.  Despite years of discussions and negotiations with Guardian, it has failed to see the extreme incompatibility of this position.  Rather, Guardian has brazenly proceeded down the dual path of

(1) alleging that the creators of the fund perpetrated a fraud on *Guardian*, despite that Guardian was the face of the fraud; and, on the other hand, (2) claiming that it can collect on the fruits of that same fraudulent Ponzi scheme.

The concept of separate entities cannot and should not be entertained.  It took all of the entities, working in concert by and through the individuals Guardian has sued, to defraud the investors who are now being pursued by the defrauding entity. For reasons of judicial integrity, fairness and common decency, this Court should not allow Guardian to take simultaneous and diametrically conflicting positions.  Defendant requests that this Court dismiss the Yang Complaint or, alternatively, stay this Adversary Proceeding until there is a decision on the merits in the Hughes and Pino Adversary cases.[2]

## II.    RELEVANT FACTUAL BACKGROUND

1.    The Guardian Fund was formed in 2016 and was originally managed by Greg Hughes and Steve Sixberry, until in 2020, when Hughes Private Capital, LLC ("HPC") became the manager.  Hughes, Sixberry and Kyle Krch (collectively, the "Individuals") were the managing members of HPC from 2020 – 2023.  Guardian Bankruptcy, Docket No. 859, p.6, lns. 10-11, p. 7, lns. 6-8 and p. 8, lns. 1-2.

2.    Prior to the formation of Guardian, Hughes and Sixberry owned and controlled numerous other failed funds.  Many of Guardian's investors were investors in these prior funds and "rolled" into Guardian by Hughes and Sixberry.  See Hughes Adversary, Docket No. 1 (the "Hughes Complaint"), ¶ 70.  A true and correct copy of the Hughes Complaint is attached hereto as Exhibit A.[3]

3.    On March 17, 2023, certain investors/members of Guardian filed an involuntary chapter 7 petition against Guardian in this Court.  See Case No. 23-50177-hlb.  On April 11, 2023, Guardian filed a voluntary chapter 11 case.  See Case No. 23-50233-hlb.  Both cases were later

---

[2] The Group intends to file a version of this Motion in each Adversary Proceeding and will file a separate request for a consolidated hearing on the Motions to Dismiss pursuant to Fed. R. Civ. Pro. 42.

[3] All capitalized but undefined terms herein shall the same meaning as set forth in the Hughes Complaint.

3

consolidated into Case No. 23-50177-hlb and the UCC was appointed. [4]

4.    Guardian and the UCC filed a Joint Chapter 11 Reorganization Plan (the "Plan") in April 2024, see Guardian Bankruptcy, Docket No. 748, thereafter, amending and supplementing the Plan several times prior to confirmation.  Id., Docket Nos. 861, 956, 997, 1040, 1065 and 1069.

5.    Relevant to this Motion, the Plan provided for the claims of Secured Investors (the "Property Owners"), who purchased properties from Guardian under a Secured Investment Agreement – most during a 1031 exchange – to be classified in Classes 6A, 6B and 6C.  Class 6B was made up of Property Owners who did not have a written "buyback guaranty" from Guardian, i.e., no written promise to repurchase properties for what the owners originally paid.[5]  Id., Docket No. 1069.  Guardian proposed in the Plan to equitably subordinate Class 6B and 6C claims and recharacterize these classes as equity interests in Guardian.  Id., pp. 19-20.

6.    On November 23, 2024, prior to confirmation of the Plan, Guardian filed a Motion Pursuant to 11 U.S.C. § 502(c)(1) Estimating Claims of Class 6B Claimants Under Second Amended Joint Plan of Reorganization (the "Estimation Motion").  Id., Docket No. 1021.  Guardian requested that the Court estimate Class 6B claims, arguing that many of those claims involved claims for fraud and misrepresentation, which claims it said, "are not only speculative [but] also will be expensive for the Class B claimants to prove." Id., p. 10.  Guardian claimed that:

> [t]he 'Secured Investment Property' to be purchased under the Secured Investment Agreement was disclosed so that the Class 6B claimants were able to perform due diligence to determine the market value of the properties at the time of their purchase. A simple online search of property values through Zillow, Redfin, or other property valuation platforms would have shown that a property owner was frequently paying more than the estimated market value for those properties at the time of purchase. They likewise could

---

[4] Defendant is aware that this Court is well versed in the background of the Bankruptcy and, therefore, will not, unless relevant herein, set forth in detail the proceedings in the Bankruptcy.

In addition, Defendant does not attach as exhibits hereto all of the exhibits that were attached to the Hughes and Pino Complaints; however, Defendant would be happy to provide paper copies if the Court requests.

[5] Class 6C property owners had written buyback guarantees from Guardian to repurchase properties for what the owners originally paid.  Id.  The majority of Class 6B investors received the same promise verbally and should this litigation move substantively forward, the Internal Note Group will submit evidence of the same.

4

have performed other due diligence such as asking about the then tenants and rent rolls or conducting appraisals and inspections of the relevant properties before purchase, as is customary in real estate purchase transactions.[6]

Id., pp. 12-13.

7.    Despite the above, in the Estimation Motion, Guardian conceded that "*it is probable that those individuals selling the properties, at least in some instances, made a false representation with the knowledge the representation was false*."  Id., Docket No. 1012, p. 10 (emphasis added).

**A.  The Hughes Adversary Proceeding**

8.    On April 11, 2025, Guardian filed the Hughes Adversary against Hughes, Sixberry, Krch and others.  See Ex. A.

9.    Guardian's introduction section of the Hughes Complaint contains allegations of fraud, specifically that the individuals who controlled Guardian and its affiliates perpetrated fraud on its investor members:

> Hughes, Krch, and Sixberry engaged *in what was or ultimately became a classic fraudulent scheme.*  Worse than their business acumen *in continuously creating new business ventures just to pay off the debts of the prior venture, is these individuals' ability to properly commit fraud. To be clear, these individuals committed fraud on an epic level and harmed* the Guardian Parties and *all those who invested in the fraudulent scheme*.  But it is not yet known how well Hughes, Krch, and Sixberry enriched themselves, but what is known is that *they simply continued creating businesses to pay off the debts of the last*.  The scheme eventually came to light and the bankruptcy proceedings of the Guardian Parties followed.
>
> As shown below, Hughes, Krch, and Sixberry proximately caused *millions of dollars in damage* to the Guardian Parties**.**  To remedy *this abhorrent misconduct*, the Guardian Parties bring this complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, *common law fraud*, and fraudulent transfer.

---

[6] The Internal Note Group denies that these allegations are accurate for various reasons and will submit evidence in opposition should this litigation proceed to substantive litigation.

5

Hughes Complaint, p. 2, lns. 7-18 (emphasis added).

10.    The first section of the "General Allegations" is titled "Hughes, Sixberry and Krch all Portray Themselves as Something They are not-Leaders in Real Estate Investment Strategy." Id., p. 4, ln. 5.  After setting forth the statements the Individuals made in marketing materials, Guardian ends the first section with "While [the Individuals] presented themselves as reputable leaders in Nevada real estate and individuals who could create wealth for Guardian's investor members, [the Individuals] *were simply rearranging the deck chairs on their own Titanic as they executed this scheme*."  Id., p. 5, lns. 1-3 (emphasis added).

11.    In the second section of the General Allegations, Guardian sets forth the history of its formation and the structure of its management, alleging that there was "such a unity of interest and ownership" in Hughes Private Capital ("HPC") – the manager of Guardian – that the Individuals are inseparable from HPC and are each alter egos of HPC.  Id., pp. 5-6.

12.    Significantly, Guardian goes on to allege that "*adherence to the notion of separate entities would sanction fraud and it would promote an injustice*" because the acts of the Individuals, jointly or on an individual basis, "inflicted extreme damages."  Id., p. 6, lns. 7-10. Guardian concludes by alleging that "Unfortunately for … its member investors, [the Individuals] ran roughshod over their contractual obligations as each used Guardian as their own piggybank to enrich themselves or HPC-related entities and to pay off other failed investments in their scheme." Id., p. 6, lns. 21-23.

13.    The third section of the General Allegations discusses how the Individuals "required capital' to "bring Guardian into fruition - and advance their scheme" so they "solicited" investors who were to receive profits after paying all operating costs of the fund, including but not limited to monthly management fees. Id., pp. 6-7.

14.    The Guardian Private Placement Memorandum ("PPM") provided investors with "no voting rights concerning the affairs of the fund." Id., p. 7, lns. 19-20.  The Individuals were the only parties who could make management decisions. Id. Participating Members had no right to take part in management, relying "entirely on the Manager," who could not be removed under

the Operating Agreement, "for Management of the fund and the operation of its business." Id., lns. 21-26.

15.    In the fourth section of the General Allegations, Guardian discusses how its Operating Agreement ("OA") prohibited the Individuals "'from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law,'" Id., p, 8, lns. 11-12, and that the PPM required each to "'exercise good faith and integrity in handling the affairs of the limited liability Fund.'" Id., p. 8, lns. 16-17.

16.    Guardian correctly quotes the PPM, stating that it "imposed 'an affirmative duty to disclose material facts' which was defined such that 'if there is a substantial likelihood that a reasonable investor would consider' the information 'important in making an investment decision' such information is 'material,'" and that the Individuals could not "'obtain an advantage at the expense of the Fund.'" Id., p. 8, lns. 18-23.

17.    Despite the fact that Investors had no voting rights, the PPM required that "'[w]hen Members are in a position to a vote for a major event' … [the Individuals] '*must* disclose to the Members the material information needed from them to give an informed consent to the suggested action.'" Id., p. 8, lns. 23-26.

18.    Guardian further alleges that the Individuals had a "duty of loyalty" imposed through the PPM that "mandated" them to "'disclose any direct or indirect conflicts that may," in the "sole and exclusive discretion [of the Individuals], exist between the interests of" the Individuals and Guardian or investors.  Id., p. 9, lns. 7-11.  Nor were the Individuals permitted to enter "'into contracts with' Guardian to advance their personal business interests over the business interests of investors. Id., lns. 12-15. Finally, Guardian notes that "other provisions confirm" that HPC and the Individuals were liable to Guardian if they received "improper personal financial benefit" or acted with "a willful failure to deal fairly with Guardian on matters where there is a material conflict of interest" or "a knowing violation of law, or willful misconduct." Id., lns. 16-19.

19.    All of the above lead Guardian to conclude its allegations regarding the conduct of the Individuals, as follows:

7

> [t]he self-interested transactions and receipt of improper personal financial benefits were such that HPC and … ***Hughes, Sixberry, and Krch willfully failed to deal fairly with Guardian on multiple matters in which there were conflicts of interest…***. and … each ***knowingly violated the law and committed repeated willful misconduct*** ….

Id., lns. 20-25 (emphasis added).

20.   Specific allegations with respect to the Property Owners prove that Guardian ***knew*** there was a fraudulent scheme perpetrated specifically on the Property Owners:

> **The Scheme Involved HPC Purchasing Properties at a Fair Market Value to Then Turn Around and Sell those Same Properties to Guardian *at Wildly Inflated Prices* so that HPC Could Profit at the Expense of Guardian.**

> Through a series of transactions, HPC and … Hughes, Sixberry, and Krch would rely upon HPC related entities, primarily, 12 Bridges, LLC, fka Home Partners, LLC ("12 Bridges"), a wholly-owned subsidiary of HPC, to purchase real properties only to then sell the properties to Guardian at ***wildly inflated prices***.

> … [i]n 2022, there are 1,742 transactions between Guardian and HPC entities in which HPC and … Hughes, Sixberry, and Krch induced Guardian to pay $82,833,242 more for the properties than the HPC-related entities acquired the properties.

> In addition to causing Guardian to purchase properties at ***inflated prices***, Hughes, Sixberry, and Krch failed to ensure that Guardian purchased title insurance when it purchased properties….

> Guardian's lack of title insurance ***caused financial harm because certain properties' title was clouded, stolen, or otherwise impaired by the acts of third parties***.

Id., p. 10, lns. 1-17 (emphasis added).

21.   Guardian goes on to admit:

> **HPC Sold Guardian's Assets to Third Party Investors at Guardian's Cost Bases and then Obligated Guardian to a Severely Unfavorable Lease-Back Term.**

> Hughes, Sixberry, and Krch also caused Guardian to sell many of its properties to third party investors ("Secured Investors") under certain Secured Investment Agreements at the same price Guardian previously paid to purchase the properties.

8

> As part of the Secured Investment Agreements, most of the Secured Investors leased their purchased properties back to Guardian with such leases promising the Secured Investors monthly fixed rent calculated as a percentage of the Secured Investors' purchase prices regardless of whether the properties were inhabitable or rented to sub-tenants to generate rental revenue.
>
> ….
>
> Additionally, as part of the sales to Secured Investors, Hughes, Sixberry, and Krch also caused Guardian to loan to Secured Investors a portion of their purchase price under carry-back notes which were supposed to be secured by the properties purchased under the Secured Investment Agreements. But Hughes, Sixberry, and Krch did not ensure that the carry-back notes were ever secured by mortgages, deeds of trust, or other security instruments, thus rendering those notes unsecured.

Id., p. 11, lns. 1-23.

**B.   The Pino Adversary Proceeding**

22.    On April 11, 2025, Guardian filed an adversary proceeding against Laurence J. Pino ("Pino") and Pino Law Group PLLC ("PLG").   See Pino Adversary, Docket No. 1 (the "Pino Complaint").   A true and correct copy of the Pino Complaint is attached hereto as Exhibit B.

23.    Pino and PLG acted as legal counsel for all of the affiliated entities making up the entire scheme including Guardian, HPC, "ROI Strategies, LLC, Guardian Fund, LLC, Guardian CV1, Guardian CV2, Guardian DE, Vista Fund, LLC, Assuravest, LLC, Teamvest, LLC, Home Partners, LLC, and KRCH Realty."  Id., ¶ 30.

24.    Guardian notes that HPC and the Individuals were members of Guardian, that they, along with Pino and PLC, concealed their own wrongdoings and caused "catastrophic losses to the company, resulting in Guardian's 2023 bankruptcy."  Id., ¶¶ 2, 5, and 7.

25.     Guardian admits that "The non-Hughes members of Guardian had **_no knowledge of management's wrongdoing_** which acts were devised and implemented with the assistance of" Pino and PLG.  Id., ¶ 3 (emphasis added).

26.    Guardian admits that "Hughes had been insolvent for a number of years and was being used as a dumping ground for losses of its affiliated entities, which were borrowing from one another in an attempt to make their sinking ships appear afloat. [HPC's] entry into these conflicted

transactions without disclosing the conflicts and the resulting bad deals led to significant losses….” Id., ¶ 22.

27.    Guardian admits that Pino and PLG assisted HPC and the Individuals in creating and implementing transactions that enriched HPC, the Individuals and other HPC-related entities, acting on all sides of the transactions and failing to properly account for the conflicts of interest. Id., ¶¶ 34 and 38.

28.    Guardian alleges that Pino and PLC “saw clear red flags red flags related to the transactions and documents they reviewed and prepared for Hughes, Guardian, and other Hughes-related entities” and knew that the Individuals were engaged in wrongdoing “in connection with the transactions that Defendants structured, oversaw, and helped close.” Id., ¶ 35.

29.    Guardian admits that HPC and the Individuals “***had significant control over each side of the transactions involving Guardian and the other entities***.” Id., ¶ 41; see also Id., ¶ 45 (“one entity—[HPC]--controlled by three individuals, ***had significant control over all sides of the transactions***.”) (emphasis added).

30.    Guardian admits that Pino and PLC “knew or should have known that Guardian would quickly spiral into deepening insolvency and ***would have to continue raising new investor money to prop up its legitimate operational activities***.” Id., ¶ 64 (emphasis added).

31.    Guardian describes the web of affiliated entities – including Guardian – controlled by HPC and the Individuals with the assistance of Pino and PLC, noting that HPC was “unable to pay its debts” which “resulted in a spiral of uncollectable notes where each [affiliated entity] was propped up by another affiliated entity’s unperformable promise to pay.” Id., ¶ 69.

32.    Guardian further admits that while by the end of 2022, it had collected $60,392,035 in member contributions, it owned only $15,312,680 in real estate assets. Id., ¶ 71.

33.    Significantly, Guardian admits that it was operating a Ponzi scheme in several paragraphs in the Pino Complaint:

    a.    “To cover up the losses and their causes, ***dividends paid to equity members came from equity contributions, not operating income. This is a classic fraudulent scheme. It shows that Guardian’s statements to its investors about the source of***

*their distributions were false*." Id., ¶ 72 (emphasis added).

      b.   By 2021, the $3.4 million in "warranty income" in the financial statements "was not income at all," but rather "this amount was comprised solely of the result of [HPC's] ***scheme in <u>paying investors with equity contributions</u> despite substantial losses*.*" Id., ¶ 74 (emphasis added).

34.    Guardian further admits that HPC and the Individuals were "misleading [Guardian's] investors" and "engaging in wrongdoing." Id., ¶ 77.

35.    Guardian accuses Pino and PLC engaging in "fraud, oppression, and malice," "extreme recklessness and intentional acts," and failed "to protect investors from insider misconduct and looting."  They further "promulgat[ed] a false or misleading offering and marketing communication or transaction opinion to investors or potential investors" and failed to disclose that "[HPC] was using Defendants' services in furtherance of wrongdoing," Id., ¶¶ 80 – 94.

36.    Guardian admits that HPC and the Individuals "failed to disclose … conflicts of interest to Guardian's investors," and "entered into contracts with Guardian that advanced the business interests of [HPC] over the interests of" Investors. Id., ¶¶ 122 – 123.

37.    Incredibly, despite acting as if it is a victim, Guardian actually admits that HPC and the Individuals "***perpetrated a fraudulent scheme <u>through Guardian</u> and other [HPC] entities***. At the time of each of the Transfers, because of the scheme and the claims of and obligations to Guardian's creditors and investors, Guardian: (a) was engaged (and was continuing to engage) in a business transaction for which Guardian's remaining property was unreasonably small; and (b) intended to incur or believed that it would incur debts beyond its ability to pay." Id., ¶ 137.

**C.  The Present Adversary Proceeding**

38.    On November 6, 2025, Guardian filed a First Amended Complaint in the instant action against Defendant, alleging five causes of action: (1) Breach of Contract; (2) Breach of the Covenant of Good Faith and Fair Dealing;[7] (3) Unjust Enrichment; (4) Objection to Claim; and (5) Turnover of Property of the Estate pursuant to 11 U.S.C. § 542(a) and (b). See Yang Complaint.

---

[7] This cause of action is ironic, to say the least.

11

### III.    LEGAL AUTHORITY AND DISCUSSION

#### A.  Motion to Dismiss For Failure To State A Claim

##### 1.  Legal Standards

###### a)  Dismissal Pursuant to Fed. R Civ. Pro 12(b)(6)

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) should be granted unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "[D]etermining whether a complaint states a plausible claim is context-specific requiring the court to draw on its experience and common sense." Iqbal, 556 U.S. at 663-63.  While the plausibility standard is not akin to a probability requirement, "it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.; see also Davies v. Deutsche Bank Nat'l Tr. Co. (In re Davies), No. CC-11-1221-MkHPa, 2012 Bankr. LEXIS 393, at *18-19 (B.A.P. 9th Cir. Jan. 12, 2012) ("If a party's complaint has 'not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.'").  Thus, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" Iqbal, 556 U.S. at 663-63 (quoting Twombly, 550 U.S. at 557).

"Although courts generally assume the facts alleged are true, courts do not 'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'" Wensley v. First Nat. Bank of Nev., 874 F. Supp. 2d 957, 962 (D. Nev. 2012) (citations omitted). Accordingly, "[c]onclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss." In re Stac Electronics Sec. Litig., 89 F.3d 1399, 1043 (9th Cir. 1996).

A defendant may raise an affirmative defense in a motion to dismiss under Rule 12(b)(6). Jones v. Bock, 549 U.S. 199, 215 (2007)). "An affirmative defense is grounds for dismissal at the pleading stage if 'the plaintiff pleads itself out of court—that is, admits all the ingredients of an

impenetrable defense….'"  Boquist v. Courtney, 32 F.4th 764, 774 (9th Cir. 2022) (internal citations omitted).  Courts are permitted to consider matters of judicial notice "without converting the motion to dismiss into a motion for summary judgment."  U.S. v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  Where a complaint cannot be saved by any amendment, dismissal without leave to amend is proper.  Intri-Plex Techs., Inc. v. Crest Grp., Inc., 499 F.3d 1048, 1056 (9th Cir. 2007).

### b)  Legal Standard for Application of Judicial Estoppel

The Ninth Circuit has held that judicial estoppel "is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position."  Hamilton v. State Farm Fire & Cas. Co., 270 F.3d 778, 782 (9th Cir. 2001) (citing Rissetto v. Plumbers & Steamfitters Local 343, 94 F.3d 597, 600-601 (9th Cir. 1996) and Russell v. Rolfs, 893 F.2d 1033, 1037 (9th Cir. 1990)).  Courts invoke the doctrine of judicial estoppel "to prevent a party from gaining an advantage by taking inconsistent positions," and "because of 'general considerations of the orderly administration of justice and regard for the dignity of judicial proceedings,' and to 'protect against a litigant playing fast and loose with the courts.'"  Id. (quoting Rolfs, 893 F.2d at 1037); see also Stoll v. Hartford, No. 05CV1907 IEG (LSP), 2006 U.S. Dist. LEXIS 81781, at *34 (S.D. Cal. Nov. 7, 2006) ("The 'essential function and justification of judicial estoppel is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage…'") (citations omitted).

"[F]ederal law governs the application of judicial estoppel in federal court."  Rissetto, 94 F.3d at 603.  Judicial estoppel "enables a court to protect itself from manipulation."  Id.; see also Cannata v. Wyndham Worldwide Corp., 798 F. Supp. 2d 1165, 1171 (D. Nev. 2011).  The Supreme Court has set forth the following factors that "courts *may* consider" in determining whether to exercise discretion and apply judicial estoppel:

> First, a party's later position must be "clearly inconsistent" with its earlier position.  Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.'  Absent success in a prior proceeding, a party's later inconsistent position introduces no 'risk of

13

inconsistent court determinations,' and thus no threat to judicial integrity.'  A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001) (internal citations omitted). "In enumerating these factors, *we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts*." Id. at 751 (emphasis added).

Judicial estoppel "is not limited to inconsistent positions in the same litigation, but is also appropriate to bar litigants from making incompatible statements in two different cases." McAdams v. Nationstar Mortg. LLC, No. 3:20-cv-2202-L-BLM, 2022 U.S. Dist. LEXIS 153677, at *8 (S.D. Cal. Aug. 24, 2022) (citing Hamilton, 270 F.3d at 783).  Where an affirmative defense appears on the face of the pleadings and other judicially noticeable documents, it is the proper subject of motion to dismiss or motion for judgment on the pleadings."  Allen v. Partington, No. LACV 20-06793-VAP (JEMx), 2020 U.S. Dist. LEXIS 189515, at *5 (C.D. Cal. Oct. 9, 2020) (citing Asarco, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1004 (9th Cir. 2014)).

### 2.  Discussion and Analysis

#### a)  Guardian Has Admitted It Was A Ponzi Scheme

The Ninth Circuit has defined a "Ponzi scheme" as follows:

A Ponzi scheme is a financial fraud that induces investment by promising high returns, usually in a short time period, where in fact no legitimate profit-making business opportunity exists. *See Winkler v. McCloskey*, 83 F.4th 720, 723 n.1 (9th Cir. 2023). We have characterized these schemes as "borrow[ing] from Peter to pay Paul" because the fraud consists of funneling money from new investors to pay old investors while cultivating the illusion of a legitimate profit-making business. *See United States v. Rasheed*, 663 F.2d 843, 849 n.1 (9th Cir. 1981) (citation and internal quotation marks omitted).

By definition, a Ponzi scheme is destined to fail because the pool of available investors is not limitless.  When the Ponzi scheme operator's pool of investors inevitably runs dry, the scheme collapses and the swindler and their entities often end up in bankruptcy or equitable receivership.

14

Kirkland v. Rund (In re EPD Inv. Co., LLC), 114 F.4th 1148, 1156-57 (9th Cir. 2024). Where there is a finding of a Ponzi scheme, "fraudulent intent may be inferred by evidence of the existence of a Ponzi scheme established through objective criteria." Id at 1152.

Notably, in beginning of the Hughes Complaint, Guardian specifically admits that the Individuals "engaged in what was or ultimately became a "classic fraudulent scheme." Hughes Complaint, p. 2. Guardian also admits that the Individuals "***continuously create[ed] new business ventures just to pay off the debts of the prior venture***." Id. This is the very definition of a Ponzi scheme.

Further, Guardian admits that the individuals "committed fraud on an epic level," harming "all those who invested in the fraudulent scheme." Id. Guardian makes a great case for fraud, indeed, for the perpetration of a Ponzi scheme, although it carefully stops short of using the term "Ponzi." Id., p. 12, lns. 14-26 (admitting that "Sixberry and Hughes also took investors from other failed investment funds controlled by them or HPC and 'rolled' those investor liabilities into Guardian"); Id., p. 13, ln. 27 – p. 14, ln. 6 (admitting that the Individuals "double-deeded" a real property to a subsidiary and an investor in Guardian).

Similarly, in the Pino Complaint, Guardian admits: that with the assistance and support of Pino and PLC, HPC and the Individuals entered into "conflicted transactions without disclosing the conflicts and the resulting bad deals led to significant losses," see Pino Complaint, ¶ 22; that HPC and the Individuals caused the entities, including Guardian, to borrow "from one another in an attempt to make their sinking ships appear afloat," id.; that HPC and the Individuals acted "on all sides of the transactions," "***had significant control over each side of the transactions involving Guardian and the other entities***," and that HPC "controlled by three individuals, ***had significant control over all sides of the transactions***." Id., ¶¶ 34, 38, 41, and 45. Guardian also admits that Pino and PLC helped HPC and Individuals "to continue [to] rais[e] new investor money to prop up" Guardian's operations, which "resulted in a spiral of uncollectable notes where each [affiliated entity] was propped up by another affiliated entity's unperformable promise to pay," id., ¶¶ 64 and 69; "to cover up the losses and their causes" by paying dividends to equity members "from equity

15

contributions, not operating income," which Guardian admits is a "classic fraudulent scheme" that "***shows that Guardian's statements to its investors about the source of their distributions were false***." Id., ¶ 72 (emphasis added).  Finally, contrary to the allegations in the Yang Complaint – in which Guardian alleges that <u>Guardian</u> is the victim of the Individuals (as well as the victim of Defendant because he will not pay this sham promissory note) – Guardian admits in the Pino Complaint that HPC and the Individuals "***perpetrated a fraudulent scheme <u>through Guardian</u>***." Id., ¶ 137.

The Internal Note Group wholeheartedly agrees with Guardian's allegations and also vehemently believes that the allegations preclude Guardian's attempt to collect on the promissory notes that Defendant (and others like him) executed in connection with Guardian's fraudulent scheme. Guardian's allegations, indeed, precisely describe investors later discovered information, in part, that purchase prices were not fair market value, that the mark up between 12 Bridges and Guardian was never disclosed, that the buyback promises ("guaranteed" to minimize investors' downside risk) were not true and that new investor money was used to pay older investors' "profits" or "returns."

**b)   <u>The Fraudulent Conduct By Guardian's Corporate Agent Must Be Imputed To Guardian</u>**

Where the Internal Note Group disagrees with Guardian is exactly who has been victimized by this fraud.  Simply put, the manner in which the Individuals set up the entities to execute their scheme, which may have resulted in saddling Guardian with some debts, does not equate to ***Guardian*** being the victim of the fraud with rights to pursue the true victims of that same fraud. As stated in <u>Uecker v. Wells Fargo Capital Fin., LLC (In re Mortg. Fund '08 LLC</u>:

> Although the imputation analysis "generally rests on questions of fact," ***"[w]here, as here, a plaintiff's own pleadings contain admissions that establish the basis of an unclean hands defense, the defense may be applied without further" proceedings***. *Peregrine Funding*, 133 Cal. App. 4th at 681-82 (ruling that trustee's claims "should have been stricken" at the outset because they pled a "classic case" of *in pari delicto*). In *Peregrine…*, one individual allegedly owned and controlled the debtor, and thus the fraudulent conduct was imputed to the debtor under *in pari delicto*.

16

> … here, the TAC alleges that MF08's sole owner and member was the Manager, which was in turn owned and controlled by the Ngs. … The Manager's conduct thus imputes to MF08, and in turn, to Uecker as trustee. … *Baena*, 453 F.3d at 7 ("***[A]ssuming fraudulent financial statements, [the managers] were, on the trustee's own version of events, the primary wrongdoers***. Thus, in the ordinary course, [state] courts would not allow [the managers] to sue a secondary accomplice . . . for helping in the wrong. ***And, if the managers' actions are imputed to [the debtor,] neither could [the debtor] (via the trustee) recover against [the third party].***").

Id., 527 B.R. 351, 369 (N.D. Cal. 2015) (emphasis added) (internal citations omitted).

Guardian was the very face of the fraud and the entity that committed the fraud; thus, it cannot portray itself as the victim to recover against the innocent third-party investors.  In this case, the Individuals used various entities, including HPC, 12 Bridges – *and Guardian specifically* – to perpetrate a fraud on its investors.  In fact, the Individuals caused Guardian to transfer investor money to 12 Bridges, caused 12 Bridges to use those investor funds to purchase properties, and then caused 12 Bridges to "sell" the properties to Guardian by signing each side of every transaction.  The Individuals then turned around and caused Guardian to sell those properties to investors at the "wildly inflated prices" they had caused Guardian to pay.  And as part of these fraudulent sales, Guardian obtained the promissory notes that it now seeks to enforce.  There was nothing "arms-length" or legitimate about any of these real property transfers. The Individuals were on all sides of every transaction. That fact alone is enough to demonstrate that Guardian ***absolutely knew*** that the prices of the properties it claims to have "bought at cost" were overinflated, sometimes by 100 to 200 percent (or more).  Yet, Guardian continues to take the position that the sale of the real properties from Guardian to Defendant was somehow an "arms-length transaction." Yang Complaint, ¶ 47.

    c) **Given Its Multiple Admissions of Fraud By Its Corporate Agents, Guardian Should Be Judicially Estopped From Benefiting From Its Own Fraud**

        1) **Guardian's Admissions In The Hughes Complaint Are Clearly Inconsistent with Enforcement Of the Promissory Notes, Unjust Enrichment Claims And Guardian's Other Claims**

17

This Court should not allow Guardian to proceed down a dual path by admitting in one case that investors were defrauded while, at the same time, alleging in another case that these same investors are being unfair by not paying promissory notes that were generated by that very same fraud. Allowing Guardian to enforce the notes and disallow investors' fraud and misrepresentation claims while also alleging that the entire scheme was fraudulent is entirely inconsistent and contradictory.

By Guardian's own admission, the real property sales were never based on any type of real valuation. Indeed, while Guardian claims to have incurred a loss by "overpaying" 12 Bridges for the properties, it was fully aware – by and through the individuals who set up the scam and signed both sides of the transaction – that the promissory notes were not based on any real consideration or linked to any sort of property value. Despite the inflated values of which Guardian had full knowledge, it caused investors to sign promissory notes that were based on false values. In other words, these are "fake" promissory notes generated by Guardian's Ponzi scheme.[8]

It is also extremely significant that Guardian was the "lender" on all of the promissory notes – there are no third-party commercial lenders involved. This structure was essential to hiding the overall fraud – had a commercial lender come in to make a loan on any of these properties, it would have required an appraisal. That would have surely revealed the fraudulent prices and Guardian's scheme would have been uncovered and exposed. Thus, Guardian intentionally kept these notes in-house.

Investor money was intended to (and did) enrich Guardian's pockets. At Guardian's own admission, it took the investment monies and used it to pay older investors – a classic Ponzi scheme. Hughes Complaint; p. 2; Pino Complaint, ¶¶ 64 – 80. Guardian also admits that it transferred investor funds to unaffiliated entities (some of which are still owned by Hughes and

---

[8] Significantly, nearly all of the investors who signed these notes were told at least two untrue things – first, that the fixed lease payments under the Lease Agreement would "offset" any interest payments owed by the investor under the note such that there would be "a wash," and, second, investors were assured that the note would "never have to be paid off" because Guardian promised to buy the properties back at the original purchase prices, whether the investor received a formal written buyback letter or not. The Internal Note Group has ample evidence of this and will present it should this litigation not be dismissed.

18

Sixberry, including Hughberry Homes, LLC), funded its managers' personal expenses and paid exorbitant management fees and "operating expenses" under the guise of "managing" the "investments."

Despite this, Guardian implies that Defendant is the bad actor because he executed an IRS form certifying the fair market value of the like-kind property received. Yang Complaint, ¶ 46. Guardian further claims that Defendant, "as the taxpayer and a buyer in an arms-length transaction, had an independent obligation to provide accurate information on the [IRS Form] in order to be able to sign its tax return under penalty of perjury" and had "knowledge of the relevant facts" when he signed the 1031 exchange forms; as such, *it is he who has* allegedly taken an inconsistent position with the IRS to the "detriment" of Guardian. Id. at ¶ 47-48. These allegations are false in light of Guardian's admissions that its entire business was a fraud and beyond the bounds of what the law permits and that the "non-Hughes members of Guardian had ***no knowledge of management's wrongdoing***," see Pino Complaint, ¶ 3 (emphasis added), which clearly negates any sort of allegation that the investors knew about the scheme and should have seen red flags. Moreover, it was *Guardian* who had Property Owners execute the affidavits/attestations to the IRS regarding the values of the real properties despite knowing that they were inflated.

In addition, this Court should understand that it is not just the Hughes and Pino Adversaries versus the Note Adversaries in which Guardian takes inconsistent and incompatible positions. Guardian has done this all along to suit itself depending on the circumstances. For instance, Guardian originally used the 1031 exchanges as a way to induce the Property Owners to buy into the real estate investment scheme. Notably, 1031 exchanges *only* pertain to real property. 26 U.S.C. § 1031(a). That was specifically acknowledged in the Purchase and Sale Agreements. Yang Complaint, ¶ 31 ("Section 4(c) of the PSA states that 'Buyer represents and warrants they … (b) do **not** believe they are purchasing a security.'") (emphasis added). Yet, throughout the Bankruptcy Case, because it suited Guardian for the purposes of the Plan to equitably subordinate the Property Owners, Guardian argued that the Property Owners actually did "purchase a security." See e.g., Guardian Bankruptcy, Docket Nos. 749, p. 24; 1021; and 1069, pp. 19-20. Guardian even

19

contradicts itself within the Yang Complaint by alleging that Defendant "purchased a security" just prior to alleging that Defendant acknowledged in the PSA that the transaction was **not** the purchase of a security.  Yang Complaint, ¶ 30 ("Mr. Yang,… is a sophisticated, accredited investor who purchased the security under the PSA for the purpose of effectuating a like-kind exchange under the Internal Revenue Code (the "1031 Exchange")") (emphasis added).  This makes little sense.

Defendant does not bring the above points to argue whether the transaction was the purchase of real property or security, but rather, to point out that Guardian takes whatever position suits it at the time.[9] Guardian cannot be allowed to continue arguing conflicting positions. Guardian cannot be allowed to pursue the Individuals on the basis that they ran a Ponzi scheme that benefitted themselves, their families and related entities and then simultaneously claim it is the ***investors*** who committed the bad acts and must pay amounts allegedly owed under fake notes based on fraudulent values. Judicial estoppel accordingly precludes Guardian from admitting to a fraudulent scheme and then enforcing notes obtained through its fraudulent scheme.

**2)** **Guardian's Admissions In The Hughes Complaint Should Be Accepted As True For Estoppel Purposes Given That Guardian Filed The Hughes Complaint Pursuant To The Bankruptcy Code and Rules, Including Fed. R. Bankr. Pro. 9011**

The second element of the analysis is whether the litigant – Guardian – has "succeeded in persuading a court to accept that party's earlier position," such that judicial acceptance of the inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled." New Hampshire, 532 U.S. at 750. Courts have observed, however, that "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle" and that the standard to apply judicial estoppel is flexible and dependent on the facts of each case. Id. at 751.

---

[9] Defendant does not waive and reserves all rights to make a substantive argument about the real property versus security issue in another pleading.  For purposes herein, Defendant is simply pointing out the contradictory and self-serving nature of Guardian's positions.

20

Here, judicial estoppel should apply even though the Hughes Adversary and the Pino adversary are pending and remain unresolved.  While the adversary proceedings against Hughes and Pino were filed separately from this case (and other Note Adversaries), all of the adversary proceedings are being pursued under the umbrella of the Guardian bankruptcy pursuant to Guardian's reorganization plan.  Additionally, all of the adversary proceedings have a common goal of collecting damages that Guardian claims it is owed.  The adversary proceedings are, therefore, not truly separate or distinct from one another.  Weinstein v. Vaughan (In re Vaughan), Nos. 13-14399-GS, 14-01128-GS, 2015 Bankr. LEXIS 4570, at *34 (Bankr. D. Nev. July 13, 2015) (citing In re Pilgrim's Pride Corp., 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010) and Cohen v. Bucci, 905 F.2d 1111, 1112 (7th Cir. 1990) (***Adversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case…***") (emphasis added); see also 7 Collier on Bankruptcy ¶ 1109.04[1][a][i] (16th ed. 2009).

These adversary proceedings are interconnected and symbiotic. Id. Both the Note Adversaries and the Hughes and Pino Adversaries were filed with regard to the claims and assets in the Guardian Bankruptcy for and on behalf of the reorganized debtor.  All were originally filed in the bankruptcy docket, and all will have an outcome on the claims and assets available for distribution.  Weinstein, 2015 Bankr. LEXIS 4570, at *25 ("it is well settled that the court may take judicial notice of the record herein "to place the evidence in appropriate context with events in the case and adversary proceedings."); Naviscent, LLC v. Otte (In re Martinez), 610 B.R. 290, 296 (Bankr. N.D. Cal. 2019) ("In the bankruptcy context, 'case' refers to the matter commenced by the filing of a petition, in addition to all adversary proceedings that arise within in it.") (citing Cohen); In re Shearer, 167 B.R. 153, 156 n.1 (Bankr. W.D. Mo. 1994) (stating that "a 'case' in Bankruptcy is commenced by the debtor's filing of a bankruptcy petition, and any subsequent litigation . . . is simply a part of the case as a whole")).

In Richman v. FWB Bank, the parties had years long, drawn out litigation.  In discussing the intertwined nature of two cases filed within the same bankruptcy case, the Court stated:

From their perspective, whatever appellants may have alleged in the

21

Discharge Action was of no consequence in the Turnover Action. *By compartmentalizing the Discharge Action and the Turnover Action, as if they were completely unrelated, they created a fiction that the events in the Discharge Action were not relevant to the events in the Turnover Action*; that view led to the ultimate conclusion that appellants could have pursued their State fraud claim in the Turnover Action. *No authority has been cited to us for the proposition that two adversary proceedings, lodged in the same bankruptcy case, involving the same parties, are nonetheless totally distinct and discrete cases, each to be considered in a vacuum. Our research suggests otherwise.*

122 Md. App. 110, 153-55, 712 A.2d 41, 62-63 (1998) (emphasis added).

As a result, Guardian cannot claim that its entire business was a Ponzi scheme in the adversary actions against Hughes and Pino and then turnaround and sue the victims of that Ponzi scheme who signed promissory notes as a result of Guardian's fraud.

> **3)** **Allowing Guardian To Enforce The Promissory Notes, Argue Unjust Enrichment And Disallow Investor Claims Would Allow Guardian An Unfair Advantage And Impose An Unfair Detriment On Investors**

The third primary judicial estoppel consideration is "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." New Hampshire, 532 U.S. at 750. This element is easily satisfied.

Notably, legal scholars have written that:

> The concern is to avoid unfair results and unseemliness. Courts are coming to focus increasingly on the question whether allowing a party to take seemingly inconsistent positions in separate actions would enable the party to gain an unfair advantage, or to impose an unfair disadvantage on its new adversary. *Absent any good explanation, a party should not be allowed to gain an advantage by litigatingon one theory, and then seek an inconsistent advantage by pursuing an incompatible theory*. This concern is informed by all the traditional views of fair dealing that might be expected in a theory developed by courts to protect themselves, and is reflected in frequent statements that judicial estoppel lies in the discretion of the trial court.

*Wright & Miller, Preclusion of Inconsistent Positions – Judicial Estoppel*, 18B Fed. Prac. Proc. Juris § 4477 (Sep. 2025) (emphasis added).  Guardian relies on incompatible theories.

First, it is ironic indeed that Guardian alleges in the Yang Complaint that "principles of equity underlie the entire bankruptcy process, and courts have applied … estoppel when a party… takes a position inconsistent with its former position which is to the disadvantage of another." Yang Complaint, ¶ 48. This legal premise is true.  The question for the Court is whether this legal principle should apply equally (or more) to the perpetrator of this fraud.

Guardian admits – in fact, sets forth a very compelling case – that its manager and the Individuals perpetrated a fraudulent Ponzi scheme by and through HPC, 12 Bridges and Guardian. Guardian was the ***actual face of the fraud***.  The bad actors who set up the scheme were on both sides of all these transactions and used Guardian as their vehicle to lure investors into the scheme. Nevada law is clear that a limited liability company can act only through corporate agents, *i.e.*, human beings. Ex parte Rickey, 31 Nev. 82, 88 (1909) (the "corporation is the principal, and its officers are its agents.").  Nevada law is also clear that fraudulent conduct committed by corporate agents is imputed to the corporate entity.  Viega GmbH v. Eight Judicial Dist. Court of the State, 130 Nev. 368, 383 (2014).  Therefore, although Guardian claims to be some sort of innocent third party, it is not.  In the interests of equity, this Court should not allow Guardian to benefit simply because its corporate agents set up multiple corporate layers in order to distance themselves from their bad acts.

Bankruptcy courts are courts of equity. Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F.2d 589, 596 (9th Cir. 1991) (bankruptcy courts "possess the power to delve behind the form of transactions and relationships to determine the substance.").  They are intended to be venues of justice and fairness. Id. Holding the perpetrators of the fraud – Hughes, Sixberry and Krch – responsible for the incredible losses is the only fair and equitable thing to do.  Requiring the victims of the same fraud to honor the falsely overinflated prices is undeniably unconscionable.

### 3.  Conclusion

In sum, Defendant asks this Court to rule that Guardian should be judicially estopped from enforcing an unlawful contract that was the result of an admitted fraudulent Ponzi scheme and dismiss the first and second causes of action for breach of contract and for breach of the implied

covenant of good faith and fair dealing. Defendant further requests that the Court dismiss the third cause of action because, for the same reasons as set forth above, Plaintiff has failed to state a claim that Defendant was unjustly enriched at <u>Guardian's</u> expense.  Further, Plaintiff has failed to state a claim for unjust enrichment given that it made no allegations in the Complaint that the Yang Note was fraudulent and unenforceable.  <u>Caldwell v. Nordic Naturals, Inc.</u>, 709 F. Supp. 3d 889, 912 (N.D. Cal. 2024) (dismissing the unjust enrichment claim because "to adequately assert quasi-contract/unjust enrichment claim, Plaintiff must allege that the contract between her and Defendant was unenforceable or void.").  As for the fourth cause of action, the Court's inquiry should not be whether the Defendant's claim is allowed or disallowed, but what the calculation of damages is considering all the factors, including the realized losses combined with the alleged tax benefits realized by the Defendant.  Finally, for all the reasons set forth above, Guardian does not have a right to collect on the note given its full participation in an "epic fraud;" thus, there is no support for a claim of turnover of property of the estate pursuant to 11 U.S.C. § 542.

Defendants, therefore, respectfully request that this Court dismiss with prejudice the first, second, third and fifth causes of action, overrule the objection to claim in the fourth cause of action and set a hearing solely on the issue of damages.

### B. <u>Motion to Stay Adversary Proceeding</u>

In the alternative, should the Court determine that the elements of judicial estoppel have not been satisfied, Defendant respectfully requests that this Court stay this adversary proceeding pending the outcome of the Hughes Adversary and Pino Adversary.

Section 105 of the Bankruptcy Code provides that a "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  "Section 105(a) is entirely discretionary."  <u>In re: Crowe</u>, Nos. Chapter 11 Proceeding, 4:19-bk-04406-BMW, 4:19-ap-00260-BMW, 2020 Bankr. LEXIS 475, at *12 (Bankr. D. Ariz. Feb. 20, 2020) (citing <u>In re Del Mission Ltd.</u>, 98 F.3d 1147, 1153 (9th Cir. 1996)); <u>see also</u> <u>Acute Inc. v. ECI Pharms. LLC (In re ECI Pharms. LLC)</u>, 669 B.R. 617, 619 (Bankr. S.D. Fla. 2025) (staying an adversary proceeding pending an appeal pursuant to 11 U.S.C. § 105(a) and

Federal Rule of Bankruptcy Procedure 7016(b)(3), which rules permits the Court on its own or a party's motion to "take other action" in an adversary proceeding). In ECI Pharms, the Court stayed an adversary proceeding pending resolution of an appeal of a confirmation order that might moot the issues in the adversary proceeding. Id. at 625-626.

In addition, federal courts possess "'inherent authority to stay federal proceedings pursuant to [their] docket management powers.'" Pub. Emps. Ret. Ass'n of N.M. v. Earley (In re PG&E Corp. Sec. Litig.), 100 F.4th 1076, 1085 (9th Cir. 2024) (quoting Ernest Bock, LLC v. Steelman, 76 F.4th 827, 842 (9th Cir. 2023)). Indeed, in Landis v. N. Am. Co., the Supreme Court stated that "the power to stay proceedings is incidental to the power inherent in every court to control the disposition of …its docket with economy of time and effort for … litigants." Landis, 299 U.S. 248, 255 (1936). Thus, a court has discretion to determine that it is more efficient for its own docket and is "the fairest course for the parties to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." Earley, 100 F.4th at 1085.

The Ninth Circuit has identified the following "non-exclusive factors" for a court to weigh in determining whether to issue a stay:

> (1) 'the possible damage which may result from the granting of a stay"; (2) 'the hardship or inequity which a party may suffer in being required to go forward'; and (3) 'the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law.'

Id. (citing Ernest Bock, 76 F.4th at 842 (quoting Lockyer, 398 F.3d at 1110)).

Here, all three factors required to stay this adversary proceeding are satisfied. First, staying the case (and all Note Adversaries) pending resolutions in the Hughes and Pino Adversaries will not damage the Plaintiff; instead, it will actually benefit Plaintiff – and even more so, its stakeholders, the creditors and members – given that Plaintiff will not be expending time, energy and (potentially) hundreds of thousands of dollars in attorneys' fees pursuing simultaneous but conflicting theories, only to lose one or both cases. That money can and should be used to pay for the Debtor's reorganization as well as estate claims, which is a benefit to both Plaintiff and its creditors and the members of Guardian. Further, as the Notes Adversaries have all been filed and

there is no pressing timeline to complete the litigation, there is no argument that a stay would be damaging to Guardian.

Second, as noted above, it would inequitable to require fraud victims to defend these adversary proceedings by proving that the investment scheme was fraudulent when (1) Guardian has already admitted the investment scheme was fraudulent; (2) Guardian is currently litigating that very issue in other cases before this very Court; and (3) these victims will unquestionably suffer further hardship (again at the hands of the defrauding entity) should they be required to pay attorneys and experts and incur litigation costs to prove the same cause of action that Guardian is already litigating. If anyone should have the burden of litigating whether there was fraud involved with Guardian's real property investment scheme, it is those responsible for the fraud.

Finally, the orderly course of justice compels a stay in these cases. For one, the Plaintiff brought the Hughes and Pino Adversaries first in time and has already spent tens of thousands of estate dollars to pursue those adversary proceedings. Second, staying these cases pending the Hughes and Pino litigations is certain to simplify and narrow the issues, proof, and questions of law for the Internal Note Group, particularly if the Court eventually makes a finding of fraud. Such a finding may leave only a few discreet issues to address in the context of the objections to claim. Narrowing the issues will assist not only the parties, but this Court, which has a busy docket.

This Court should respectfully stay the Yang Adversary Proceeding in the interests of judicial economy, fairness and equity.

## IV.    CONCLUSION

Based on the foregoing, Defendant Yang respectfully requests that the Court enter its order dismissing the First, Second, Third and Fifth Causes of Action with prejudice for failure to state a claim upon which relief may be granted based on the principle of judicial estoppel, overrule the objection to claim in the Fourth Cause of Action and set an evidentiary hearing solely to prove damages; or, in the alternative, for an order staying this Adversary Proceeding pursuant to 11 U.S.C. § 105(a), Fed. R. Bankr. Pro.

7016(b)(3) and this Court's inherent powers pending the outcome the Hughes Adversary and the Pino Adversary.

DATED this 15th day of January, 2026.

SIMONS HALL JOHNSTON PC

/s/ Brad M. Johnston, Esq.
BRAD M. JOHNSTON, ESQ.
*Attorney for Defendant*

FLETCHER & LEE, LTD.

/s/ Elizabeth Fletcher, Esq.
ELIZABETH FLETCHER, ESQ.
*Attorney for Defendant*

27

# EXHIBIT A

Sallie B. Armstrong (NSBN 1243)
John A. Fortin (NSBN 15221)
McDONALD CARANO LLP
100 W. Liberty Street, 10th Floor
Reno, Nevada 89501
Telephone: (775) 788-2000
sarmstrong@mcdonaldcarano.com
jfortin@mcdonaldcarano.com

*Attorneys for Guardian Fund, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re | Case No. 23-50177-hlb |
| | Case No.: 23-50233-hlb |
| GUARDIAN FUND, LLC, | **Consolidated Under Case No. BK-23-50177-hlb** |
| ☐ AFFECTS THIS DEBTOR | Chapter 11 |
| ☐ AFFECTS GUARDIAN CV1, LLC | Jointly Administered with: |
| ☐ AFFECTS GUARDIAN CV2, LLC | |
| ☒ AFFECTS ALL DEBTORS | |

| 23-50951-hlb | Guardian CV1, LLC |
|---|---|
| 23-50952-hlb | Guardian CV2, LLC |

Debtors.

GUARDIAN FUND, LLC, a Nevada limited liability company, GUARDIAN CV1, LLC, a Delaware limited liability company, and GUARDIAN CV2, LLC, a Delaware limited liability company,

Plaintiffs,

v.

GREG HUGHES, an individual; KYLE KRCH, an individual; SANDRA KRCH, an individual; STEVE SIXBERRY, an individual; KRCH REALTY, LLC, a Nevada limited liability company; DOES 1-10 inclusive; and ROE ENTITIES 1-10 inclusive,

Defendants.

**Adversary No.:**

**ADVERSARY COMPLAINT**

Plaintiffs Guardian Fund, LLC ("Guardian "), Guardian CV1, LLC ("CV1") and Guardian CV2, LLC ("CV2") (Guardian, CV1, and CV2 collectively, the "Guardian Parties" or "Plaintiffs"), by and through their attorneys, for their Adversary Complaint against Defendants Greg Hughes ("Hughes"), Kyle Krch ("Krch"), Sandra Krch ("Sandra"), Steve Sixberry ("Sixberry"), and Krch Realty, LLC ("Krch Realty") complain and allege as follows:

## NATURE OF THE CASE

Hughes, Krch, and Sixberry engaged in what was or ultimately became a classic fraudulent scheme.  Worse than their business acumen in continuously creating new business ventures just to pay off the debts of the prior venture, is these individuals' ability to properly commit fraud. To be clear, these individuals committed fraud on an epic level and harmed the Guardian Parties and all those who invested in the fraudulent scheme.  But it is not yet known how well Hughes, Krch, and Sixberry enriched themselves, but what is known is that they simply continued creating businesses to pay off the debts of the last.  The scheme eventually came to light and the bankruptcy proceedings of the Guardian Parties followed.

As shown below, Hughes, Krch, and Sixberry proximately caused millions of dollars in damage to the Guardian Parties.  To remedy this abhorrent misconduct, the Guardian Parties bring this complaint for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, common law fraud, and fraudulent transfer.

## JURISDICTION AND VENUE

1.      This is a core proceeding under 28 U.S.C. § 157(b)(2) and is brought pursuant to 11 U.S.C. §§ 108, 544, 546, 547, 548, 550, and 1141.

2.      This Court has jurisdiction as to the claims for relief asserted herein under 28 U.S.C. §§ 157 and 1334.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

4.      If this Court should determine that this is not a core proceeding, Plaintiffs consent to entry of a final judgment by this Court.

/ / /

/ / /

2

<strong><u>THE PARTIES</u></strong>

5. Guardian is and was at all relevant times a limited liability company organized under the laws of the State of Nevada.

6. CV1 is and was at all relevant times a limited liability company organized under the laws of the State of Delaware.

7. CV2 is and was at all relevant times a limited liability company organized under the laws of the State of Delaware.

8. Hughes is and was at all relevant times a resident of the State of Nevada and previously served as a Manager of Guardian and as the President/Director or Manager of Hughes Private Capital, Inc., fka and successor-in-interest to Hughes Private Capital, LLC ("HPC"), in its capacity as subsequent Manager for Guardian .

9. Krch is and was at all relevant times a resident of the State of Nevada and previously served as the Secretary or Manager of HPC.

10. Sandra is and was at all relevant times a resident of the State of Nevada and is married to Krch.

11. Sixberry is and was at all relevant times a resident of the State of Nevada and previously served as a Manager of Guardian and as the Treasurer or Manager of HPC, in its capacity as subsequent Manager for Guardian.

12. Krch Realty is and was at all relevant times a limited liability company organized under the laws of the State of Nevada.

13. The true names and capacities, whether individual, corporate, associate or otherwise, of DOES 1 through 10 inclusive and ROE ENTITIES 1-10 are unknown to the Guardian Parties who therefore sue the DOE and ROE Defendants by such fictitious names. Upon information and belief, each of the fictitiously named DOE and ROE Defendants have, or claim to have, an interest in, or are in some manner liable for, the matter alleged in this Complaint. Upon information and belief, DOES 1 through 10 and ROE Entities 1-10 were the agents, trustees, employees, representatives, servants, partners, alter-egos, principals or co-conspirators of each other, acting within the scope of such agency, service, partnership, joint venture, trust, or conspiracy, and that each is in some way

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

responsible for the alleged events in this Complaint and are liable to the Guardian Parties for the injuries caused thereby. When the true names or capacities of DOES 1 through 10 and ROE Entities 1-10 are ascertained, the Guardian Parties will amend this Complaint accordingly.

**GENERAL ALLEGATIONS**

    **A.**    **Hughes, Sixberry, and Krch all Portray Themselves as Something They are not—Leaders in Real Estate Investment Strategy.[1]**

14.    Hughes presented himself as a leader in the industry and "Founder and Chief Executive Offer" of HPC. As he pronounced in Guardian's Operating Agreement, Hughes' "expertise is derived from 34 years of experience in the real estate industry working various roles in investment management, building financial models and strategies, and has built his own commercial buildings which he still owns and manages today.  Over the last decade, Greg raised over $123 million dollars, and under his management bought and sold 1,150 single-family residences in more than a dozen states."  *See* **Exhibit 1**, Guardian Private Placement Memorandum § 11.2 (without Exhibit A).

15.    Sixberry presented himself "as the Founder and Chief Operating Officer of" HPC, and "his responsibilities include oversight of operations for the entire" HPC "family of companies, investment strategy, business planning, legal research, and co-management of four real estate investment options." Sixberry's "experience in business, finance and real estate is derived from over 30 years as owner or principal in more than a dozen companies." *Id*.

16.    Krch was a founder and principal of Krch Realty, which was sold to HPC sometime around September 2020. After that date, Krch became a manager and officer of HPC. Throughout all relevant times in this Complaint, Krch Realty acted as property manager for most of the Guardian Parties' properties and received compensation from Guardian for those activities.

---

[1] To the extent that the allegations contained herein must be supported by particularized facts under Fed. R. Civ. P. 9 and Fed. R. Bankr. P. 9009, the Guardian Parties reserve the right to seek discovery as the information necessary to meet the particularity pleading requirements is possessed by Hughes, Sixberry, and Krch.  *See Rocker v. KPMG LLP*, 122 Nev. 1185, 148 P.3d 703 (2006).

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

17.     While these three presented themselves as reputable leaders in Nevada real estate and individuals who could create wealth for Guardian's investor members, Hughes, Sixberry, and Krch were simply rearranging the deck chairs on their own Titanic as they executed this scheme.

**B.      The Guardian Fund was Formed on April 15, 2016, and is a Manager-Managed Limited Liability Company in which Hughes, Sixberry, and Hughes Private Capital were the Managers.**

18.     On April 15, 2016, Hughes and Sixberry caused Guardian to be formed by filing Articles of Organization with the Nevada Secretary of State.

19.     Hughes and Sixberry were the initial managers of Guardian and remained managers until on or about June 1, 2020.

20.     On June 1, 2020, Hughes and Sixberry as the Managers of HPC signed Guardian's Operating Agreement as the representative of Guardian.  *See* **Exhibit 2**, Guardian Operating Agreement § 4.2.

21.     Hughes and Sixberry countersigned as the authorized representatives and Manager of Guardian. *See id*.

22.     Indeed, Section 4.1 of Guardian's Operating Agreement details that "the day-to-day operations of the Company shall be conducted by the Manager, and all management of the Company shall be vested in the Manager.  The Manager shall have full and complete authority, power, and discretion to make any and all decisions in the normal course of the Company's business and to do any and all things that the Manager shall deem to be reasonably required to accomplish the business and objectives of the Company."

23.     With these broad contractual powers provided, "[i]n the event the Manager does not comply with the standard of care set forth herein, in compliance with the requirements set forth herein, or breaches this Agreement, the Manager *shall* be liable to the Company and the Members for any and all damages caused directly or indirectly by said non-compliance or breach and the Company and/or the Members may pursue an action against the Manager."  *See* **Exhibit 2**, Guardian Operating Agreement § 4.4 (emphasis added).

24.     HPC was governed, influenced, and controlled by Hughes, Sixberry, and/or Krch because either jointly or individually through single acts and the accumulation of those single acts,

5

MCDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

Hughes, Sixberry, and/or Krch are the alter egos of HPC and each are therefore individually liable as the Manager of Guardian as defined in that NRS 78.747.

25. Indeed, there was such a unity of interest and ownership such that Hughes, Sixberry, and/or Krch are inseparable because either jointly or individually through single acts and the accumulation of those single acts, Hughes, Sixberry, and/or Krch are the alter egos of HPC and each are therefore individually liable as the Manager of Guardian.

26. Furthermore, adherence to the notion of separate entities would sanction fraud and it would promote an injustice to Guardian and its members because of Hughes, Sixberry, and/or Krch joint or individual acts and the accumulation of those single acts inflicted extreme damages such that each are individually liable as the Manager of Guardian.

27. Other provisions of the Guardian Operating Agreement confirm Hughes, Sixberry, and Krch's power in that "[o]nly the manager and agents of the Company authorized by the Manager shall have the authority to bind" Guardian. *See* **Exhibit 2**, Guardian Operating Agreement § 4.7.

28. Additionally, as HPC's alter egos, Hughes, Sixberry, and Krch "shall have the right to perform or exercise any of its rights or duties under this Agreement through delegation to or contract with affiliates of" HPC "provided that all contracts with affiliated entities are on terms at least as favorable to" Guardian "as could be obtained through arms-length negotiations with unrelated third parties; and further provided that notwithstanding such delegation" HPC's alter egos, Hughes, Sixberry, and Krch "shall remain primarily responsible for the active supervision of the work performed." *Id*. § 4.10.

29. Unfortunately for Guardian and its member investors, Hughes, Sixberry, and Krch ran roughshod over their contractual obligations as each used Guardian as their own piggybank to enrich themselves or HPC-related entities and to pay off other failed investments in their scheme.

**C.** **The Guardian Members Obtained Contractual Benefits that Imposed Burdens on HPC and its Alter Egos, Hughes, Sixberry, and Krch.**

30. In order to bring Guardian into fruition—and advance their scheme—Hughes, Sixberry, and Krch required capital.

/ / /

31.     Thus, they solicited capital from "accredited investors" as that term is defined by the Securities Act of 1933, as amended by virtue of compliance with the provisions of Rule 506(c) of Regulation D.  **Exhibit 1**, Guardian Private Placement Memorandum § 1.1 (defining the accredited investor standard).

32.     Members were permitted to purchase a single membership unit of Guardian for $1,000.  *See id*. § 14.7 (defining capital contribution).

33.     Guardian proclaimed that "the Fund is expected to use the proceeds from this Offering of Units to (i) pay fees and expenses relating to the organization of the Fund and the sale of the Units, (ii) invest in Qualified Investments, and (iii) establish working capital reserves for the Fund to fund operating and other expenses of the Fund." *Id*. § 5.

34.     Part of the operating expenses were the monthly management fees of either (1) $120,000 or 2.0% gross assets under management.  *Id*. § 7.1.

35.     Additionally, the offering detailed that HPC, its alter egos Hughes, Sixberry, and Krch along with HPC's affiliates "may receive substantial fees and profits under the provisions of the Operating Agreement of the Fund." *Id*. § 2.4.

36.     Member investors "shall receive distributions ('Profit Participation') after the payment of all Fund expenses to the extent of and in proportion to their Invested Capital Contributions." *Id*. at § 2.8.3.

37.     Member investors, however, possessed "no voting rights concerning the affairs of the Fund." *Id*. at § 2.8.1.

38.     As the Private Placement Memorandum detailed, HPC and its alter egos Hughes, Sixberry, and Krch "will make all decisions with respect to the management of the Fund. Participating Members will have no right or power to take part in the management of the Fund. Therefore, they will be relying entirely on the Manager for Management of the fund and the operation of its business.  The Manager may not be removed under the Operating Agreement." **Exhibit 1**, Guardian Private Placement Memorandum § 10.20.

/ / /

/ / /

7

**D. In Exchange for the Investment with no Voting Power, the Investor Members Burden HPC and its Alter Egos Hughes, Sixberry, and Krch with Significant Fiduciary Duties.**

39. While the Member investors provided significant power to Hughes, Sixberry, and Krch as HPC's managers and alter egos, the Member investors received significant consideration in exchange.

40. For example, in Nevada, the default for managers is that only the "contractual covenant of good faith and fair dealing" applies including "fiduciary duties" unless the duty is "prescribed by the articles of organization or the operating agreement." NRS 86.298(1)-(2).

41. Within Guardian's Operating Agreement, the Member investors obtained heightened protections because when HPC's alter egos, Hughes, Sixberry, and Krch performed for Guardian, each were required to "discharge" their duties to Guardian and "refrain[ ] from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law." **Exhibit 2**, Guardian Operating Agreement § 4.9.

42. The Private Placement Memorandum expands on those responsibilities and details so that HPC and its alter egos Hughes, Sixberry, and Krch "is accountable to a limited liability Fund as a fiduciary and consequently must exercise good faith and integrity in handling the affairs of the limited liability Fund." **Exhibit 1**, Guardian Private Placement Memorandum § 9.

43. To meet those responsibilities, the Private Placement Memorandum imposed "an affirmative duty to disclose material facts" which was defined such that "if there is a substantial likelihood that a reasonable investor would consider" the information "important in making an investment decision" such information is "material." *Id*. § 9.1.

44. To that end, HPC and its alter egos Hughes Sixberry, and Krch "cannot obtain an advantage at the expense of the Fund." *Id*. Abrogating Section 2.8.1's lack of voting rights, "[w]hen Members are in a position to a vote for a major event" HPC and its alter egos Hughes, Sixberry, and Krch "***must*** disclose to the Members the material information needed from them to give an informed consent to the suggested action." *Id*. (Emphasis added.)

/ / /

/ / /

McDONALD CARANO

2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE 702.873.4100 • FAX 702.873.9966

45.     The Private Placement Memorandum additionally imposed a duty of care which mandated HPC and its alter egos Hughes, Sixberry, and Krch to "perform its duties with care, skill, diligence and prudence of like persons in like positions." *Id*. § 9.2.

46.     This required HPC and its alter egos Hughes, Sixberry, and Krch to "discharge" their duties to Guardian by "refraining from engaging in grossly negligent or reckless conduct, willful or intentional misconduct, or a knowing violation of law." *Id*.

47.     The Private Placement Memorandum likewise imposed a duty of loyalty which mandated HPC and its alter egos Hughes, Sixberry, and Krch each had a "duty to disclose any direct or indirect conflicts that may" in HPC and its alter egos Hughes, Sixberry, and Krch "sole and exclusive discretion, exist between the interests of" HPC and its alter egos Hughes, Sixberry, and Krch and "the interests of the Fund or any of the individual Member" investors. *Id*.

48.     Furthermore, HPC and its alter egos Hughes, Sixberry, and Krch were each "prohibited from entering into contracts with the Fund that advance the business interests of" HPC and its alter egos Hughes, Sixberry, and Krch "over the business interests of the Fund or any of its individual Members." *Id*.

49.     Indeed, other provisions confirm that HPC and its alter egos Hughes, Sixberry, and Krch were "not liable for monetary damages unless it involves receipt of improper personal financial benefit, a willful failure to deal fairly with the Fund on matters where there is a material conflict of interest, a knowing violation of law, or willful misconduct." *Id*. § 10.19.

50.     As shown below, the self-interested transactions and receipt of improper personal financial benefits were such that HPC and its alter egos Hughes, Sixberry, and Krch willfully failed to deal fairly with Guardian on multiple matters in which there were conflicts of interest.

51.     HPC and its alter egos Hughes, Sixberry, and Krch each knowingly violated the law and committed repeated willful misconduct such that there are many grounds for Guardian to hold Hughes, Sixberry, and Krch liable personally as HPC's alter egos and otherwise.

/ / /

/ / /

/ / /

9

**E.    The Scheme Involved HPC Purchasing Properties at a Fair Market Value to Then Turn Around and Sell those Same Properties to Guardian at Wildly Inflated Prices so that HPC Could Profit at the Expense of Guardian.**

52.    Through a series of transactions, HPC and its alter egos Hughes, Sixberry, and Krch would rely upon HPC related entities, primarily, 12 Bridges, LLC, fka Home Partners, LLC ("12 Bridges"), a wholly-owned subsidiary of HPC, to purchase real properties only to then sell the properties to Guardian at wildly inflated prices.

53.    For instance, in 2022, there are 1,742 transactions between Guardian and HPC entities in which HPC and its alter egos Hughes, Sixberry, and Krch induced Guardian to pay $82,833,242 more for the properties than the HPC-related entities acquired the properties.

54.    In addition to causing Guardian to purchase properties at inflated prices, Hughes, Sixberry, and Krch failed to ensure that Guardian purchased title insurance when it purchased properties from 12 Bridges or other HPC-related entities.

55.    Guardian's lack of title insurance caused financial harm because certain properties' title was clouded, stolen, or otherwise impaired by the acts of third parties.

56.    All of these actions constitute material breaches by HPC and its alter egos Hughes, Sixberry, and Krch of their fiduciary duties owed to Guardian and its Member investors contractually bargained for rights.

**F.    The Scheme Additionally Involved HPC Borrowing Unsecured Funds from Guardian to Fund Entities Wholly Owned or Controlled by HPC.**

57.    From Guardian's inception through March 17, 2023, HPC and its alter egos Hughes, Sixberry, and Krch caused Guardian to loan in excess of $50,000,000 to 12 Bridges ("12 Bridges Note").

58.    HPC did not secure these loans with collateral, including mortgages or deeds of trust, despite 12 Bridges using the money primarily to purchase real properties.

59.    As of March 28, 2023, the 12 Bridges' Note held a balance of $25,826,630.

60.    As best Guardian can understand, HPC also used around $8,813,307 of Guardian's money to purchase homes for Hughberry Homes, a new business venture of HPC with no affiliation to Guardian.

10

**G.      HPC Sold Guardian's Assets to Third Party Investors at Guardian's Cost Bases and then Obligated Guardian to a Severely Unfavorable Lease-Back Term.**

61.      Hughes, Sixberry, and Krch also caused Guardian to sell many of its properties to third party investors ("Secured Investors") under certain Secured Investment Agreements at the same price Guardian previously paid to purchase the properties.

62.      As part of the Secured Investment Agreements, most of the Secured Investors leased their purchased properties back to Guardian with such leases promising the Secured Investors monthly fixed rent calculated as a percentage of the Secured Investors' purchase prices regardless of whether the properties were inhabitable or rented to sub-tenants to generate rental revenue.

63.      The leases also saddled Guardian with substantial future liabilities for the repairs and maintenance of the Secured Investors' leased properties even though Guardian had earned no profit from the initial sales of the properties to the Secured Investors.

64.      Additionally, as part of the sales to Secured Investors, Hughes, Sixberry, and Krch also caused Guardian to loan to Secured Investors a portion of their purchase price under carry-back notes which were supposed to be secured by the properties purchased under the Secured Investment Agreements. But Hughes, Sixberry, and Krch did not ensure that the carry-back notes were ever secured by mortgages, deeds of trust, or other security instruments, thus rendering those notes unsecured.

65.      As of March 17, 2023, the outstanding balance of the carry-back notes owed to Guardian was approximately $16,410,056.

66.      Guardian has had an extremely difficult time trying to collect the carry-back notes from Secured Investors because Hughes, Sixberry, and Krch failed to ensure that the notes were secured by collateral.

**H.      In Addition to or in the Alternative, Hughes, Sixberry, and Krch are Liable to Guardian as the Officers and Directors of HPC as Each Intentionally Implemented and Knowingly Permitted Actions Adverse to Guardian.**

67.      Hughes, Sixberry, and Krch's personal liability does not simply flow based on the Court discarding the corporate cloak of limited liability.

/ / /

11

68. Indeed, based on all of the above allegations, Hughes, Sixberry, and Krch intentionally implemented their fraudulent scheme with full knowledge that it would harm Guardian by virtue of the fact that Hughes, Sixberry, and Krch knowingly induced HPC and its affiliates to take adverse actions against Guardian.

69. For example, on December 29, 2021, Sixberry, Hughes, and Krch caused Guardian to loan Raptor 6, LLC, an entity owned and controlled by Sixberry, the principal sum of $1.7 million on an unsecured basis. The maturity date was 90 days after the lender's "written notice or demand for repayment." Guardian has been unable to confirm whether this loan was ever repaid to Guardian, but even if it was repaid, the self-interested loan reduced Guardian's available cash during the duration of the loan.

70. Sixberry and Hughes also took investors from other failed investment funds controlled by them or HPC and "rolled" those investor liabilities into Guardian either as new unsecured debts or equity of Guardian.

71. Minimal to no consideration was paid to Guardian to assume these new equity interests and debts, the effect of which was to increase Guardian's liabilities if those investors elected to be treated as noteholders or to dilute Guardian's existing equity holders if investors were rolled in as new equity holders of Guardian.

72. To the best of Guardian's knowledge, on or about January 2021, Hughes and Sixberry caused investors of an entity called Advanced Commission, LLC to be rolled into Guardian as new equity in Guardian totaling $455,000.

73. To the best of Guardian's knowledge, on or about November 2020, Hughes and Sixberry caused investors of an entity called Sentinel, LLC to be rolled into Guardian as new equity in Guardian totaling $218,324.51 and new unsecured debt of $12,549.67.

74. To the best of Guardian's knowledge, on or about December 31, 2020, Hughes and Sixberry caused investors of an entity called ROI Strategies, LLC to be rolled into Guardian as new equity totaling around $5.5 million under an Agreement and Plan of Merger.

75. Under the Agreement and Plan of Merger, Guardian obtained some assets from ROI Strategies, LLC consisting of real properties with an estimated market value totaling approximately

12

$1.6 million, a promissory note from Main Street Investments with an unpaid balance of around $664,000, and an uncollectible promissory note from 12 Bridges with an unpaid balance of around $3.3 million.

76. The Agreement and Plan of Merger was detrimental to Guardian because its existing equity holders' interests were diluted by the new equity of around $5.5 million even though Guardian did not receive valuable consideration equal to or greater than $5 million.

77. On or about June 4, 2020, Hughes, Sixberry, and Krch sponsored a loan to CV1 from a predecessor of Wilmington Trust, N.A., as Trustee for the benefit of Holders of CoreVest American Finance 2020-3 Trust Mortgage Pass Through Certificates in the principal amount of $2,881,000 ("Loan 1") to allegedly refinance debt on existing properties owned by Guardian, but the properties had no existing debt at the time.

78. On or about June 18, 2021, Hughes, Sixberry, and Krch sponsored a loan to CV2 from a predecessor of Wilmington Trust, N.A., as Trustee for the benefit of Holders of CoreVest American Finance 2021-2 Trust Mortgage Pass Through Certificates in the principal amount of $3,134,000 ("Loan 2") to allegedly refinance debt on existing properties owned by Guardian, but the properties had no existing debt at the time.

79. CV1 and CV2 were created as wholly-owned special purpose entities of Guardian to facilitate Loan 1 and Loan 2, and Hughes and Krch caused the properties that served as collateral for Loan 1 and Loan 2 to be transferred from Guardian to CV1 and CV2.

80. Hughes and Krch also caused Guardian to guaranty Loan 1 and Loan 2, with such guarantees secured by Guardian's equity interests in CV1 and CV2.

81. The proceeds of Loan 1 and Loan 2 were not used to refinance any existing debt of Guardian, or to improve the value and condition of the CV1 and CV2 properties. Instead, Hughes, Sixberry, and Krch caused the proceeds of Loan 1 and Loan 2 to be diverted from Guardian, CV1, and CV2 to HPC and its related entities, even though Guardian, CV1, and CV2 were saddled with the secured loan obligations.

82. As another example, Hughes, Sixberry, and Krch also "double-deeded" the property located at 118 Winchester Drive, Bessemer, AL 35022, by causing 12 Bridges to sell the property

13

to CV1 and to be pledged as collateral for Loan 1. But then before the Loan 1 transaction closed, they also caused Guardian to sell the same property to a Secured Investor.

83.     The "double-deeded" property harmed Guardian by clouding the title of the property. The result was that Guardian was liable to the Loan 1 lender for the impaired collateral and also liable to the Secured Investor who subsequently purchased the clouded property while it was encumbered by Loan 1.

**I.     Hughes, Sixberry, and Krch's Fraudulent Transfers Must be Avoided.**

84.     In addition to failing to observe corporate formalities and breaching their fiduciary duties by the wrongful acts described above, there were several avoidable fraudulent transfers made to Hughes, Sixberry, and Krch.

85.     For example, on September 29, 2021, Krch entered into a Secured Investment Agreement with 12 Bridges (not Guardian) for the purchase of five properties for a total price of $479,152.40.

86.     Despite the Secured Investment Agreement and related lease being between Krch and 12 Bridges, Hughes, Sixberry, and Krch caused Guardian to assume the lease obligations and associated expenses without receiving consideration from 12 Bridges.

87.     Under this transaction, Hughes, Sixberry, and Krch caused Guardian to pay to Krch fixed rent of $55,002.70 in total from December 1, 2021, through March 1, 2023.

88.     For a period of twelve months during that time, the fixed rent paid to Krch by Guardian was calculated at $3,793.29 per month, which was equal to a 9.5% annual return on Krch's Secured Investment Agreement purchase price of $479,152.40.  Krch received preferential treatment because other Secured Investors during that time period were receiving fixed rent under their leases of 6-7.5% annually, not 9.5%.

89.     The fixed rent paid by Guardian to Krch, plus any other lease-related expenses to be proven at trial, were fraudulent transfers.

90.     On May 26, 2021, Sandra and Kyle Krch (the "Krchs") entered into a Secured Investment Agreement with 12 Bridges (not Guardian) for the purchase of two properties for a total price of $115,087.21.

14

91. Despite the Secured Investment Agreement and related lease being between the Krchs and 12 Bridges, Hughes, Sixberry, and Krch caused Guardian to assume the lease obligations and associated expenses without receiving consideration from 12 Bridges.

92. Under this transaction, Hughes, Sixberry, and Krch caused Guardian to pay the Krchs fixed rent of $21,058.09 in total from September 1, 2021, through March 1, 2023.

93. For a period of fifteen months during that time, the fixed rent paid to the Krchs by Guardian was calculated at $911.11 per month, which was equal to a 9.5% annual return on the Krchs' Secured Investment Agreement purchase price of $115,087.21. Krchs received preferential treatment because other Secured Investors during that time period were receiving fixed rent under their leases of 6-7.5% annually, not 9.5%.

94. The fixed rent paid by Guardian to Krchs, plus any other lease-related expenses to be proven at trial, were fraudulent transfers.

95. On May 26, 2021, the Krchs entered into a Secured Investment Agreement with 12 Bridges (not Guardian) for the purchase of two properties for a total price of $152,036.95.

96. Despite the agreement and lease being between Krchs and 12 Bridges, Hughes, Sixberry, and Krch caused Guardian to assume the lease obligations and associated expenses without receiving consideration from 12 Bridges.

97. Under this transaction, Hughes, Sixberry, and Krch caused Guardian to pay Krchs fixed rent of $15,944.37 in total from September 1, 2021, through March 1, 2023.

98. For a period of fifteen months during that time, the fixed rent paid to Krchs was calculated at $1,203.63 per month, which was equal to 9.5% annual return on the Krchs' Secured Investment Agreement purchase price of $152,036.95. The Krchs received preferential treatment because other Secured Investors during that time period were receiving fixed rent under their leases of 6-7.5% annually, not 9.5%.

99. The fixed rent paid by Guardian to Krchs, plus any other lease-related expenses to be proven at trial, were fraudulent transfers.

100. Hughes, Sixberry, and Krch also regularly charged their personal expenses on HPC credit cards issued by Capital One which were then paid by HPC with monies from Guardian.

15

101.    For example, from January 4, 2024, through February 3, 2023, Hughes charged $157,308.61 in total on his HPC-issued Capital One card.

102.    From December 4, 2024, through January 3, 2023, Hughes charged $95,827.27 in total on his HPC-issued Capital One card.

103.    From November 4, 2022, through December 3, 2022, Hughes charged $60,725.31 in total on his HPC-issued Capital One card.

104.    From October 4, 2022, through November 3, 2022, Hughes charged $86,458.66 in total on his HPC-issued Capital One card.

105.    From September 4, 2022, through October 3, 2022, Hughes charged $82,496.08 in total on his HPC-issued Capital One card.

106.    From June 4, 2022, through July 3, 2022, Hughes charged $164,691.58 in total on his HPC-issued Capital One card.

107.    From May 4, 2022, through June 3, 2022, Hughes charged $128,807.66 in total on his HPC-issued Capital One card.

108.    From April 4, 2022, through May 3, 2022, Hughes charged $80,012.73 in total on his HPC-issued Capital One card.

109.    From March 4, 2022, through April 3, 2022, Hughes charged $86,929.39 in total on his HPC-issued Capital One card.

110.    From February 4, 2022, through March 3, 2022, Hughes charged $73,595.72 in total on his HPC-issued Capital One card.

111.    The above-described Capital One credit card statements are attached hereto as **Exhibit 3**. Many of Hughes' credit card charges were at retail stores and other merchants that provided goods or services to Hughes for his personal use and such charges were unrelated to any legitimate business expenses of HPC or Guardian.

112.    Notwithstanding that Hughes made the charges for personal use, HPC paid the credit card charges from money obtained from Guardian and for which Guardian received inadequate consideration.

16

113.    From January 27, 2021, through April 27, 2021, HPC paid certain personal expenses for or on behalf of Sixberry and Krch with monies obtained from Guardian and for which Guardian received inadequate consideration. *See* **Exhibit 4** attached hereto.

114.    Based on the foregoing, the Guardian Parties now bring the following causes of actions against Defendants.

**FIRST CAUSE OF ACTION**

**(Declaratory Relief)**

**All Defendants**

115.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

116.    Congress provides this Court authority under 28 U.S.C. § 2201(a) to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

117.    Nevada's Legislature likewise provided this Court similar statute authority under NRS 30.040 to "declare rights, status, and other legal relations whether or not further relief is or could be sought."

118.    There is a live case and controversy and colorable dispute that requires judicial resolution as to whether HPC's corporate cloak should be disregarded such that Hughes, Sixberry, and Krch are the companies alter egos.

119.    Hughes, Sixberry, and Krch influenced and governed HPC.

120.    There is a unity of interest and ownership between Hughes, Sixberry, and Krch and HPC such that the individuals and the entity are inseparable.

121.    If this Court permits Hughes, Sixberry, and Krch to adhere to the notion of separate entities, such adherence would be to allow and sanction a fraud on this Court, and it would promote a grave injustice.

122.    HPC was undercapitalized, as evidenced by the Chapter 7 case it filed.

123.    Based on information and belief, Hughes, Sixberry, and Krch commingled the Guardian Parties' funds with HPC, its affiliates, and vice versa.

124.    Based on information and belief, Hughes, Sixberry, and Krch diverted funds from HPC to the other entities on which Hughes, Sixberry, and Krch relied for their scheme.

125.    Based on information and belief, Hughes, Sixberry, and Krch treated HPC's funds as if they were their own.

126.    Based on information and belief, Hughes, Sixberry, and Krch failed to observe HPC's corporate formalities.

127.    As demonstrated above, Hughes, Sixberry, and Krch's actions taken directly and as alter egos of HPC are the proximate cause of the significant damages the Guardian Parties suffered.

128.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

## SECOND CAUSE OF ACTION

### (Breach of Fiduciary Duty)

### All Defendants

129.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

130.    The Guardian Operating Agreement is an enforceable contract.

131.    The Guardian Private Placement Memorandum is an enforceable contract.

132.    CV1's operating agreement is an enforceable contract.

133.    CV2's operating agreement is an enforceable contract.

134.    Because all these agreements are enforceable contracts, Hughes, Sixberry, and Krch each owed the Guardian Parties and their Member investors the duties of loyalty and care as detailed above because each either jointly or individually is an alter ego of HPC.

135.    Alternatively, as managers and directors of the Guardian Parties and HPC, Hughes, Sixberry, and Krch intentionally implemented and knowingly permitted actions adverse to the Guardian Parties despite possessing fiduciary duties to the Guardian Parties.

18

136.    Hughes, Sixberry, and Krch breached their fiduciary duties of loyalty and care in the ways detailed above.

137.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages the Guardian Parties suffered.

138.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages. *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

<u>**THIRD CAUSE OF ACTION**</u>

**(Breach of Contract)**

**All Defendants**

139.    The Guardian Parties repeat, reallege, and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

140.    The Guardian Operating Agreement is an enforceable contract.

141.    The Guardian Private Placement Memorandum is an enforceable contract.

142.    CV1's operating agreement is an enforceable contract.

143.    CV2's operating agreement is an enforceable contract.

144.    Both as HPC's alter egos and directly, Hughes, Sixberry, and Krch failed to materially perform their obligations under the Guardian Operating Agreement, the Guardian Private Placement Memorandum, CV1's operating agreement, and CV2's operating agreement.

145.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages the Guardian Parties suffered due to Hughes, Sixberry, and Krch's breach of contract.

146.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or

special damages. *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

## FOURTH CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

**All Defendants**

147.   The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

148.   The Guardian Operating Agreement is an enforceable contract.

149.   The Guardian Private Placement Memorandum is an enforceable contract.

150.   CV1's operating agreement is an enforceable contract.

151.   CV2's operating agreement is an enforceable contract.

152.   In every contract there is an implied covenant of good faith and fair dealing, under which the parties are precluded from taking actions which would contravene the spirit and intent of the agreement so as to deny the other party its justified expectations under the contract.

153.   As HPC's alter egos, Hughes, Sixberry, and Krch owed an implied duty of good faith and fair dealing to the Guardian Parties.

154.   The Guardian Parties reasonably relied on Hughes, Sixberry, and Krch to act in a manner that was faithful to the purpose of the Guardian Operating Agreement, the Guardian Private Placement Memorandum, CV1's operating agreement, and CV2's operating agreement.

155.   Hughes, Sixberry, and Krch unreasonably deprived the Guardian Parties and their Member investors of their expectations under the Guardian Operating Agreement, the Guardian Private Placement Memorandum, CV1's operating agreement, and CV2's operating agreement as described above.

156.   As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages the Guardian Parties suffered due to Hughes, Sixberry, and Krch's breach of the implied covenant of good faith and fair dealing.

157.   It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore,

the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

**FIFTH CAUSE OF ACTION**

**(Conversion)**

**All Defendants**

158.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

159.    Without lawful justification, Hughes, Sixberry, and Krch removed the Guardian Parties' profits, property, and other material benefits from the Guardian Parties and unlawfully transferred possession of and interfered with, derogated, excluded, and/or defiled the Guardian Parties' property rights.

160.    Without lawful justification, Hughes, Sixberry, and Krch diverted funds to HPC and other affiliates through wrongful transfers in which the Guardian Parties did not receive a fair market exchange or value in return by unlawfully transferring possession of and interfering with, derogating, excluding, and/or defiling the Guardian Parties' property rights.

161.    Hughes, Sixberry, and Krch's actions were tortious, unlawful, and cannot be justified or excused by any law.

162.    All the property obtained from these conversions must be disgorged and returned to the Guardian Parties today.

163.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages the Guardian Parties suffered due to Hughes, Sixberry, and Krch's conversion.

164.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

**SIXTH CAUSE OF ACTION**

**(Intentional Interference with Prospective Economic Relations)**

**All Defendants**

165.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

166.    Guardian Parties possessed prospective contractual relationships regarding the significant real properties the Guardian Parties possessed and leased to tenants, or that Guardian leased from Secured Investors.

167.    HPC along with Hughes, Sixberry, and Krch were aware of the prospective business relationships the Guardian Parties possessed by virtue of the significant real properties the Guardian Parties possessed and leased to tenants or that Guardian leased from Secured Investors.

168.    HPC along with Hughes, Sixberry, and Krch committed intentional torts intended or designed to disrupt the business relationship of the Guardian Parties and without privilege or justification to do so.

169.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages Guardian suffered due to Hughes, Sixberry, and Krch's intentional interference with the Guardian Parties' prospective economic relationships.

170.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

**SEVENTH CAUSE OF ACTION**

**(Fraud: Intentional Misrepresentation)**

**All Defendants**

171.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

/ / /

22

172.    Section 9.1 of Guardian's Private Placement Memorandum mandated that HPC and its alter egos Hughes, Sixberry, and Krch had "an affirmative duty to disclose material facts" which was defined such that "if there is a substantial likelihood that a reasonable investor would consider" the information "important in making an investment decision" such information is "material." *Id*. § 9.1.

173.    Hughes, Sixberry, and Krch failed to disclose material information including the facts described herein.

174.    Hughes, Sixberry, and Krch knew that these omissions were material facts.

175.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages Guardian suffered due to Hughes, Sixberry, and Krch's intentional misrepresentations and/or omissions of material facts.

176.    It has become necessary for Guardian to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Guardian is entitled to recover fees and costs incurred herein as general, specific and/or special damages. *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

## EIGHTH CAUSE OF ACTION

### (Civil Conspiracy)

### All Defendants

177.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

178.    Hughes, Sixberry, and Krch acting in concert through the conduct described above intended to accomplish an unlawful objective by transferring and/or receiving the Guardian Parties' assets, profits, and/or property without providing equivalent value to the Guardian Parties.

179.    Hughes, Sixberry, and Krch had a meeting of the minds regarding the objective of the conspiracy to deprive the Guardian Parties of their assets, profits and/or property and the means of pursuing it.

/ / /

23

180.    Hughes, Sixberry, and Krch actions were intentional, willful, and malicious and the Guardian Parties are entitled to punitive and exemplary damages under NRS 42.005.

181.    As demonstrated above, Hughes, Sixberry, and Krch's actions are the proximate cause of the significant damages the Guardian Parties suffered due to Hughes, Sixberry, and Krch's intentional misrepresentations and/or omissions with the Guardian Parties' prospective economic relationship.

182.    It has become necessary for the Guardian Parties to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, the Guardian Parties are entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

## NINTH CAUSE OF ACTION

### (Intentional Fraudulent Transfer – 11 U.S.C. §§ 544 and 548(a)(1)(a))

### All Defendants

183.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

184.    Guardian is entitled to avoid the fraudulent transfers detailed above under 11 U.S.C. §§ 544 and 548(a)(1)(A) because Hughes, Sixberry, and the Krchs conspired with actual intent to hinder, delay, and defraud Guardian to which Guardian was or became liable for liabilities at the time the fraudulent transfers were made.

185.    The fraudulent transfers include but are not limited to those transactions described in Paragraphs 84 through 113 above.

186.    The fraudulent transfers were property of Guardian under the Bankruptcy Code.

187.    The fraudulent transfers occurred within two (2) years of the filing of Guardian's Bankruptcy Petition.

188.    Recovery is appropriate under 11 U.S.C. § 550(a)(1) and (2), which provide that, to the extent that a transfer is avoided under 11 U.S.C. §§ 544 and/or 548, Guardian is entitled to

24

recover the transferred property, or the value thereof, from the initial transferee and any immediate or mediate transferee of such initial transferee.

189.    It has become necessary for Guardian to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Guardian is entitled to recover fees and costs incurred herein as general, specific and/or special damages. *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

<u>**TENTH CAUSE OF ACTION**</u>

**(Constructive Fraudulent Transfer – 11 U.S.C. §§ 544 and 548(a)(1)(B))**

**All Defendants**

190.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

191.    Guardian is entitled to avoid the fraudulent transfers identified in Paragraphs 84 through 113 above under 11 U.S.C. §§ 544 and 548(a)(1)(B) because Guardian was insolvent at the time of, and/or became insolvent as a result of Hughes, Sixberry, and the Krchs' actions.

192.    At the time of the complained of transactions, Guardian's liabilities exceeded its assets or it was generally unable to pay its debts as a result of Hughes, Sixberry, Krch, and Sandra's actions.

193.    Guardian received less than a reasonably equivalent value in exchange for such transfer or obligation and Guardian became insolvent on the date the transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation.

194.    Recovery is appropriate under 11 U.S.C. § 550(a)(1), which provides that, to the extent that a transfer is avoided under 11 U.S.C. §§ 544 and /or 548, Guardian is entitled to recover the transferred property, or the value thereof, from the initial transferee.

195.    Guardian is entitled to recover the assets that were fraudulently transferred.

196.    It has become necessary for Guardian to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Guardian is entitled to recover fees and costs incurred herein as general, specific and/or special damages. *See*

25

*Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

## ELEVENTH CAUSE OF ACTION

### (Preferential Transfers – 11 U.S.C. § 547(b)(4))

### All Defendants

197.    The Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

198.    Guardian is entitled to avoid the preferential transfers under 11 U.S.C. § 547(b)(4)(B).

199.    The preferential transfers constitute a transfer of property of Guardian under the Bankruptcy Code.

200.    For example, between March 17, 2022, through March 16, 2023, Guardian paid to Sixberry the sum of $323,262.00 on account of antecedent debts.

201.    Between December 17, 2022, through March 16, 2023, Guardian paid to Krch Realty the sum of $306,956.00 on account of antecedent debts.

202.    The preferential transfers occurred between 90 days and 1 year of the filing of the Petition by Guardian.

203.    Avoidance of payments to Sixberry, and Krch Realty are all appropriate under 11 U.S.C.  § 547(b)(4)(B).

204.    There may be other avoidable preferential transfers among the Defendants that Guardian will also seek to avoid under Section 547 of the Bankruptcy Code.

205.    It has become necessary for Guardian to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Guardian is entitled to recover fees and costs incurred herein as general, specific and/or special damages.  *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

/ / /

/ / /

26

## TWELFTH CAUSE OF ACTION

### (Uniform Fraudulent Transfer Act – NRS 112.180(1)(a))

### All Defendants

206.    Guardian Parties repeat, reallege and incorporate each paragraph contained in the General Allegations above as though fully set forth herein.

207.    Guardian is entitled to avoid the fraudulent transfer under Nevada's Uniform Fraudulent Transfer Act ("UFTA") at NRS 112.180 *et seq*. pursuant to § 544.

208.    Guardian is entitled to avoid the fraudulent transfers identified in Paragraphs 84 through 113 above under NRS 112.180 because Guardian was insolvent at the time of, and/or became insolvent as a result of Hughes, Sixberry, Krchs' actions.

209.     At the time of the complained of transactions, Guardian's liabilities exceeded its assets or it was generally unable to pay its debts as a result of Hughes, Sixberry, Krchs' actions.

210.    Guardian received less than a reasonably equivalent value in exchange for such transfer or obligation and Guardian became insolvent on the date the transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation.

211.    Recovery is appropriate under Nevada law, which provides that, to the extent that a transfer is avoided under NRS 112.180, Guardian is entitled to recover the transferred property, or the value thereof, from the initial transferee and any immediate or mediate transferee of such initial transferee.

212.    Guardian is entitled to recover the assets that were fraudulently transferred.

213.    It has become necessary for Guardian to engage the services of an attorney in these proceedings as a direct and proximate result of the conduct alleged above and, therefore, Guardian is entitled to recover fees and costs incurred herein as general, specific and/or special damages. *See Sandy Valley Assoc. v. Sky Ranch Estates Owners Assoc.*, 117 Nev. 948, 960, 35 P.3d 964, 971 (2001); *see also* Fed. R. Civ. P. 9(g).

/ / /

/ / /

/ / /

27

**PRAYER FOR RELIEF**

1.      For a judgment against Hughes, Sixberry, Krch, Sandra, and Krch Realty for general and special damages;

2.      For a declaration holding that Hughes, Sixberry, and Krch are HPC's alter egos;

3.      For reasonable attorney's fees and costs of suit incurred herein, and as special damages under FRCP 9(g) and *Sandy Valley* and its progeny, including all collection costs and post-judgment activities required of Guardian to enforce its judgment;

4.      For prejudgment and post-judgment interest at the highest rate permitted by law; and

5.      Any other relief this Court deems just and proper.

Dated this 11th day of April, 2025

McDONALD CARANO LLP

By: */s/ Sallie B. Armstrong*
         Sallie B. Armstrong (NSBN 1243)
         John A. Fortin (NSBN 15221)
         100 West Liberty Street, Tenth Floor
         Reno, Nevada 89501
         Telephone:  (775) 788-2000
         sarmstrong@mcdonaldcarano.com
         jfortin@mcdonaldcarano.com

         *Attorneys for Guardian Fund, LLC*

# EXHIBIT B

HARRIS LAW PRACTICE LLC
STEPHEN R. HARRIS, ESQ. (NSBN 1463)
Email: steve@harrislawreno.com
NORMA GUARIGLIA, ESQ. (NSBN 16244)
Email: norma@harrislawreno.com
850 E. Patriot Blvd., Suite F
Reno, NV 89511
Telephone: (775) 786-7600
*Attorneys for Guardian Fund, LLC, Plaintiff*

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

\* \* \* \* \*

IN RE:

GUARDIAN FUND, LLC,

☒  AFFECTS THIS DEBTOR

☐  AFFECTS GUARDIAN CV1, LLC

☐  AFFECTS GUARDIAN CV2, LLC

☐  AFFECTS ALL DEBTORS

     Debtors.

_____/

GUARDIAN FUND, LLC, a Nevada
limited liability company,

       Plaintiff,

    v.

LAURENCE J. PINO, an individual, AND
PINO LAW GROUP PLLC fka
PINONICHOLSON, PLLC aka PINO
NICHOLSON, PLLC, a Florida limited
liability company,

       Defendants.

_____/

Case No.: BK-23-50177-hlb
Case No.: BK-23-50233-hlb
**Consolidated Under Case No. BK-23-50177-hlb**
(Chapter 11)

Jointly Administered with:

| 23-50951-hlb | Guardian CV1, LLC |
|---|---|
| 23-50952-hlb | Guardian CV2, LLC |

Adv No.:

**COMPLAINT**

Plaintiff Guardian Fund, LLC ("Guardian" or "Plaintiff"), by and through its attorneys, for its Complaint against Defendants Laurence J. Pino ("Pino") and Pino Law Group PLLC fka PinoNicholson, PLLC aka Pino Nicholson, PLLC ("Pino Law") complain and allege as follows:

**INTRODUCTION**

1.      Guardian was driven into bankruptcy after its ad hoc Investment Advisory Committee found serious discrepancies in Guardian's financial records. Those discrepancies and the actions leading to the financial problems are the result of breaches of fiduciary duty and other misconduct by Guardian's former manager, Hughes Private Capital, Inc. fka Hughes Private Capital, LLC ("Hughes"), and the principals of Hughes.

2.      Hughes was aided in this wrongdoing by Guardian's attorney, Pino and his law firm, Pino Law. Defendants, in breach of their contractual and professional duties, allowed and facilitated Hughes's' use of Defendants' services to carry out their breaches of fiduciary duty and other misconduct, causing significant harm to Guardian.

3.      The non-Hughes members of Guardian had no knowledge of management's wrongdoing which acts were devised and implemented with the assistance of Defendants.

4.      Defendants had a duty of "undivided loyalty" to its client: Guardian. An attorney's duty of undivided loyalty is designed to assure the attorney's absolute and exclusive commitment to the client. This requirement of the attorney-client relationship exists to benefit and protect the client and enhance the public's confidence in the legal profession.

5.      Defendants disregarded their responsibilities to Guardian. In so doing, Defendants violated their professional, fiduciary, and ethical obligations, thus causing harm to their client, Guardian.

6.      After November 2022, several of Guardian's non-Hughes members became part of Guardian's ad hoc Investment Advisory Committee and received access to Guardian's general ledger. The discrepancies in Guardian's financial records were shocking. In response to these discrepancies, and to dislodge Hughes from management, the Investment Advisory Committee forced Guardian to enter bankruptcy in 2023.

7.      As a result of Defendants' breaches and negligence, Guardian suffered substantial harm. Its harm includes the following: (1) paying legal fees for services that were not competently performed; (2) incurring legal expenses and going into increased debt because of adverse and

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

2

conflicted financial and investment transactions involving Guardian that were designed by Hughes with Defendants' advice and assistance; (3) incurring substantial costs in investigating the wrongdoing that Defendants' breaches helped conceal; and (4) catastrophic losses to the company, resulting in Guardian's 2023 bankruptcy.

## PARTIES

8.      Guardian is a Nevada limited liability company and citizen of Nevada with its principal place of business in Nevada.

9.      Pino is an individual, citizen of Florida, and licensed attorney in Florida, New York, and California.

10.     Pino Law is a Florida limited liability company and citizen of Florida with its principal place of business within the state of Florida. It provides legal services to the public.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this adversary proceeding and pendent jurisdiction over related state law claims set forth in this Complaint pursuant to 28 U.S.C. §§ 157(a) and (b), 28 U.S.C. § 1334, Federal Rule of Bankruptcy Procedure 7001 and Local Rule 1001(b)(1).  This Court also has subject matter jurisdiction over this action because the claims involve federal bankruptcy law (11 U.S.C. §§ 547 and 548), exceed the jurisdictional amount of $75,000, and complete diversity of citizenship exists between Guardian and the Defendants.

12.     Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409 as Guardian is a Nevada limited liability company with its principal place of business in Nevada, its chapter 11 case is pending in this district, and the claims arise out of actions that caused harm in Nevada.

13.     This Court has personal jurisdiction over Pino and Pino Law because the claims arise out of the Defendants' purposeful availment of Nevada in providing regular legal services about Nevada law to Guardian, a citizen of Nevada, that caused harm to Guardian in Nevada.

14.     This adversary proceeding arises under Title 11 of the United States Code (the "Bankruptcy Code") and arises in or is related to Guardian's above captioned Chapter 11 case.

15.     This is a core proceeding pursuant to 28 U.S.C. § 157. However, if the Court finds

one or all, or less than all causes of action to be non-core, then Guardian does consent to entry of final order or judgment by the United States Bankruptcy Court, pursuant to Fed. R. Bankr. P. 7008.

## BACKGROUND

16.     **Guardian** was formed in 2016. It had over 10 members. Between 2016 and 2023, it was managed first by Greg Hughes and Steve Sixberry, and then by Hughes.

17.     Hughes was controlled by Greg Hughes, Steve Sixberry, and, after 2019, Kyle Krch. Hughes also owned or managed Krch Realty, Assuravest, 12 Bridges (f/k/a HomePartners), Vista Fund, Advanced Commission, RIO Strategies, and Hughberry.

18.     According to its 2020 Private Placement Memorandum ("2020 PPM"), Guardian "was formed for the purpose of investing in income producing real property or first trust deeds." According to the 2020 PPM, "Investors shall receive profit distributions made after the payment of all Fund expenses ('Profit Participation') to the extent of and in proportion to their Invested Capital Contribution." And the 2020 PPM states that Guardian expects "to use the proceeds from this Offering of Units to (i) pay fees and expenses relating to the organization of the Fund and the sale of the Units, (ii) invest in Qualified Investments, and (iii) establish working capital reserves for the Fund to fund operating and other expenses of the Fund."

19.     In an Investor Kit, Hughes claimed that it would make regular payments to Guardian from rental revenues. Hughes claimed to potential investors that Guardian invested in assets that "are investment grade, no[n] speculative, providing consistent net returns." Hughes also claimed that investors' returns were based off two things: "1. Your investment amount; 2. The performance of Hughes Capital's real estate portfolio as a whole."

20.     The 2020 PPM recognized that Guardian's manager, Hughes, "is accountable to a limited liability Fund as a fiduciary." The memo outlines a "Duty of Loyalty": "The Manager has a duty to disclose any direct or indirect conflicts that may, in Manager's sole and exclusive discretion, exist between the interests of the Manager and the interests of the Manager and the interests of the Fund or any individual Members. The Manager is prohibited from entering into

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

4

contracts with the Fund that advance the business interests of the Manager over the business interests of the Fund . . . ."

21. Hughes violated this duty of loyalty. It caused Guardian to enter into transactions with other companies affiliated with Hughes, including Hughes itself, 12 Bridges, and KRCH Realty. Through these affiliated entities, Hughes bought residential properties and sold them to Guardian, entering into arrangements with purported guaranteed rental income to Guardian. As a result of these transactions, Hughes associated entities owed Guardian more than $30 million by 2023. 12 Bridges owed $25 million, largely from a note with interest that grew in the millions each year; KRCH Realty owed $490,000; and Hughes itself owed $5 million.

22. These promises were empty. Guardian was unable to recover from these conflicted transactions. As Guardian later learned, Hughes had been insolvent for a number of years and was being used as a dumping ground for losses of its affiliated entities, which were borrowing from one another in an attempt to make their sinking ships appear afloat. Hughes' entry into these conflicted transactions without disclosing the conflicts and the resulting bad deals led to significant losses for Guardian, ultimately causing its bankruptcy in 2023.

23. Guardian received no benefit from Hughes' failure to disclose its conflicts. To the contrary, it incurred significant harm.

24. **Pino and Pino Law** provide legal services, including legal advice, opinion letters, and preparing transactional documents.

25. Pino Law's website homepage says, "we pride ourselves on producing Big Law outcomes delivered by a small boutique firm of exceptionally experienced and very seasoned lawyers, investors, business professionals, and entrepreneurs."

26. Pino Law's website also explains that its "breadth and depth" of practice "covers everything commercial," including business and investment law, securities and investments, asset and estate planning, and strategic consulting.

27. Pino, the founding partner of Pino Law, is admitted to practice law in Florida, New York, and California. In addition to holding a Juris Doctor degree, Pino also has a doctorate in

business administration from the University of Florida.

28. Pino Law's website states that Pino "has transacted numerous real estate, stock and investment ventures for himself and his clients exceeding $2 billion in value."

29. Hughes contracted with Pino Law no later than February 14, 2020 to provide legal services to and for Guardian. Guardian was an intended beneficiary of that contract. Pino was the licensed lawyer within Pino Law primarily responsible for the legal services provided to Guardian.

30. Guardian was not the only Hughes company for which Defendants were providing legal services. Defendants provided legal services to other Hughes entities, including at least the following entities: Hughes Private Capital, ROI Strategies, LLC, Guardian Fund, LLC, Guardian CV1, Guardian CV2, Guardian DE, Vista Fund, LLC, Assuravest, LLC, Teamvest, LLC, Home Partners, LLC, and KRCH Realty .

31. Starting no later than February 14, 2020 to April 2023, Defendants continuously served as Hughes and Guardian's outside counsel with respect to the preparation and implementation of Guardian's 2020 PPM and related corporate and transactional documents. Guardian relied heavily on Defendants given its lack of meaningful experience in sophisticated investment and corporate documents and transactions.

32. Defendants taught Hughes how to structure the investments and transactions for Guardian: (a) in connection with the 2020 PPM; and (b) in connection with certain Secured Investment Agreements and related leases, including how to sell those investments to investors as 1031 exchanges. Defendants also performed other corporate, securities, and investment-related professional services; assisted Hughes with learning how to market Guardian's investments to potential investors; and vouched for Hughes and Guardian and their investments in the marketplace.

33. However, Defendants repeatedly breached their duties, failing to protect their client, Guardian, because many of the transactions created and implemented by Hughes with

Defendants' assistance were detrimental to Guardian to enrich Hughes, its principals, and other Hughes-related entities.

34.     Defendants were acting as legal counsel on all sides of the transactions. Defendants violated the Rules of Professional Conduct and breached their duties by accepting clients adverse to Guardian and without Guardian's informed consent and enforceable conflict waivers. Defendants' representation of those other clients conflicted with their representation of Guardian.

35.     Defendants saw clear and repeated red flags related to the transactions and documents they reviewed and prepared for Hughes, Guardian, and other Hughes-related entities. Defendants knew or should have known that Hughes and its principals were engaged in wrongdoing and were harming Guardian in connection with the transactions that Defendants structured, oversaw, and helped close.

36.     Despite the red flags and actual knowledge that their client, Guardian, was being harmed, Defendants continued to violate their duties to Guardian. For instance, in 2022 alone, there are 1,742 transactions between Guardian and Hughes entities in which Hughes and its principals caused Guardian to pay $82,833,242 more for properties than the Hughes-related entities paid to acquire the properties. These transactions were all carried out based on the transactions, documents, and advice that Defendants structured as part of their legal services to Hughes, Guardian, and other Hughes entities.

37.     Each transaction resulting from Defendants' legal advice drove Guardian deeper into insolvency, as Guardian was used as the main "piggy-bank" for Hughes and other Hughes entities. Had Defendants acted properly, they would have helped protect Guardian's legal and financial interests instead of assisting Hughes with creating transactions that legally and financially harmed Guardian.

///

///

**A.      Defendants failed to properly document their representations and conflicted representations of Hughes, Guardian, and other Hughes entities.**

38.      Defendants failed to properly document their representation of Hughes, Guardian, and other Hughes entities, were conflicted in those representations, and did not properly account for those conflicts.

39.      Defendants understood that Hughes, as Guardian's manager, owed a fiduciary duty to Guardian, which had outside investors and members.

40.      Defendants also represented Hughes and other Hughes entities such as 12 Bridges, Krch Realty, and other investment funds operated under Hughes' control.

41.      Hughes had significant control over each side of the transactions involving Guardian and the other entities, and Defendants knew that and also provided Hughes with more means of significant control through transactions carried out with the legal advice from Defendants.

42.      Despite providing legal services for all these conflicted entities, Defendants executed an engagement agreement with Hughes but never executed an engagement agreement with Guardian.

43.      Defendants never obtained informed written conflict waivers between and among Hughes, Guardian, and other Hughes entities represented by Defendants, to the extent such conflicts were waivable.

44.      Defendants knew that the affiliated nature of the entities participating in the transactions, and the entities' roles, required them to employ a higher level of scrutiny for wrongdoing, especially given that Defendants represented the seller, the lender, the buyer, and the buyer's and seller's managing member in transactions carried out under the advice of Defendants.

45.      Defendants failed to adequately advise Guardian to put in place appropriate checks, balances, and oversight features to mitigate the risks for abuse given that one entity—Hughes--controlled by three individuals, had significant control over all sides of the transactions.

46. Defendants were required to give their undivided loyalty and the highest of fiduciary obligations, including to avoid conflicts, to Guardian, but they did not. Instead, Defendants provided legal advice that created more conflicts that caused Guardian serious legal and financial harm.

47. As explained above, Defendants assumed a very broad scope of representation of Hughes, Guardian, and other Hughes entities.

48. Defendants represented in public advertisements and to Hughes and Guardian that they had the expertise and willingness to teach Hughes and Guardian how to structure profitable, legally sound, real estate investment funds.

49. Defendants' broad scope of representation is evidenced by, among other things, the scope of services it performed and was expected to perform, and items reasonably and readily apparent to them. In fact, the February 14, 2020, Engagement Agreement between Hughes and Pino Law states that Defendants would represent Hughes with respect to "General Legal Services."

50. On March 27, 2020, Defendants gave Hughes a Law Firm Opinion Letter ("Opinion Letter") related specifically to Guardian. Specifically, Defendants reviewed and analyzed Guardian's Private Placement Memorandum and Operating Agreement dated February 2017; the Amended and Restated Private Placement Memorandum and Operating Agreement dated October 2018; and a Subscription Agreement and Accredited Investor Letter dated January 17, 2020.

51. The Opinion Letter was signed by Pino, as Managing Partner, and by William N. Johnson, Chairman, Financial Advisory Practice.

52. The Opinion Letter recommended that Guardian "terminate the [prior] Offering and create a new, non-integrated Offering with enhanced and more robust disclosures . . ."

53. After the Opinion Letter, Defendants went on to provide Hughes, Guardian, and other Hughes entities with the legal advice and services to structure, prepare, and implement the "new offering" recommended by Defendants in their Opinion Letter.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

9

54.     As part of Defendants' legal services to Guardian in connection with the "New Offering," Defendants provided legal advice and prepare documents including, but not limited to: (a) Guardian's June 1, 2020, Operating Agreement; (b) Guardian's June 2020 Private Placement Memorandum; (c) Secured Investment Agreements with related attachments, including leases for Guardian to lease back the real properties it sold to third-party investors; (d) various forms of secured investor acknowledgements and subscription agreements; (e) new member/investor qualification profile forms.

55.     The documents and transactions structured and created by Defendants for Guardian for the New Offering harmed Guardian's legal and financial interests as more fully described previously, ultimately resulting in Guardian's bankruptcy.

**B**.     **Defendants were motivated to earn legal fees from work on all sides of the conflicting transactions.**

56.     Defendants were motivated by their desire to keep earning legal fees from work performed for Hughes, Guardian, and other Hughes entities and to advance their close, special relationship with, and allegiance to, the principals of Hughes: Greg Hughes, Steve Sixberry, and Kyle Krch.

57.     Defendants received payment of legal fees directly from Guardian or from other Hughes entities with money that originated from Guardian. Those legal fees, which are still being discovered by Guardian, include but are not limited to the payments described below.

58.     On February 14, 2023, Guardian Fund, LLC made a payment of $21,226.53 to Laurence J. Pino.

59.     On February 16, 2023, Guardian Fund, LLC made a payment of $3,000 to Pino Law Group PLLC.

60.     On April 10, 2020, HPC made a payment of $5,724.37 to Laurence J. Pino.

61.     On May 1, 2020, HPC made a payment of $17,556 to Laurence J. Pino.

62.     On June 12, 2020, HPC made a payment of $12,376.87 to Laurence J. Pino.

63.     During 2022, Krch Realty paid Laurence J. Pino total payments of $72,821.40

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

10

64. Based on the structure of the transactions of the New Offering, Defendants knew or should have known that Guardian would quickly spiral into deepening insolvency and would have to continue raising new investor money to prop up its legitimate operational activities.

65. Moreover, in continuing to provide legal services to Guardian in connection with the New Offering, Defendants had a duty to inquire and investigate as to the adequacy of the structure of the New Offering, and whether it was harming Guardian's legal and financial interests. A reasonable inquiry would have alerted Defendants to Guardian's worsening financial condition after the New Offering.

66. In 2021, for example, Guardian reported to the IRS on its tax return net *positive* income of over $5 million. Guardian's income statement shows that this net positive income was almost entirely supplied by two sources: some $1.5 million in unpaid interest income and $3.4 million in "warranty" income. Together, these two sources accounted for more than $4.9 million of Guardian's claimed positive income for 2021. But as the architects of the New Offering, Defendants knew, or if they had exercised due diligence would have known, that these were empty numbers for several reasons.

67. First, the alleged income from unpaid interest was never going to be realized because the notes on which it was owed were uncollectable.

68. Guardian's 2021 balance sheet shows that its assets included over $13 million in notes from affiliated entities, including Hughes, 12 Bridges/Home Partners, and KRCH Realty. By 2022, Guardian's balance sheet reflected a note due from 12 Bridges/Home Partners of $25 million. 12 Bridges/Home Partners' balance sheet, in turn, was being propped up by a negative intercompany liability with its owner, Hughes.

69. While all roads led to Hughes, Hughes had millions in negative retained earnings at all material times (nearly $5 million in 2021), rendering it unable to pay its debts. This resulted in a spiral of uncollectable notes where each was propped up by another affiliated entity's unperformable promise to pay. Defendants knew or should have known these notes and associated interest were uncollectable because it represented all of these entities in the related transactions

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

11

that grew out of the New Offering.

70.    Guardian received no benefit from its balance sheet reflecting these uncollectable notes and was in fact damaged by this conduct.

71.    Second, Guardian's balance sheet and income statements showed its core business was losing money but still reporting positive income. For example, at the end of 2022, Guardian, a real estate fund, had only $15,312,680 in real estate assets on its balance sheet but had $60,392,035 in member contributions. In the same year, Guardian's income statement shows gross rental income of $10,283,743 with property expenses of $13,007,171 and a net operating loss of $2,723,428. As a rental real estate fund, Guardian's financials show that its core business was losing millions each year after the New Offering. But the income statement was being propped up by unpaid interest and unpaid warranty income from its manager and affiliates.

72.    To cover up the losses and their causes, dividends paid to equity members came from equity contributions, not operating income. This is a classic fraudulent scheme. It shows that Guardian's statements to its investors about the source of their distributions were false. Defendants knew or should have known this information by virtue of their legal and professional services provided to Hughes, Guardian, and other Hughes entities involved on all sides of transactions related to the New Offering.

73.    Guardian received no benefit from paying dividends from equity contributions and was in fact damaged by this conduct.

74.    Third, the warranty income line was not income at all. The worksheets backing the returns showed a liability labeled "warranty" that covered the shortfall between what Guardian paid investors in dividends and fixed rent versus Guardian's net operating income. By 2021, this amount had grown to $3.4 million. Defendants knew or should have known that this amount was comprised solely of the result of Hughes' scheme in paying investors with equity contributions despite substantial losses.

75.    Guardian received no benefit from reporting this warranty income and was in fact damaged by this conduct.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

12

76.     Other facts should have alerted Defendants to the problems with the New Offering. Specifically, during Defendant's legal representation, disgruntled investors of Guardian and other Hughes entities threatened or initiated legal actions against Hughes, Guardian, and other Hughes parties because of alleged losses and complaints arising from their investments in those entities—many of which were part of the New Offering. Defendants knew of these investor complaints and legal actions.

77.     Based on all of the above, and more to be proven at trial, Defendants knew or should have known soon after they created the New Offering that Hughes was misleading investors, engaging in wrongdoing, failing to operate Guardian in a proper and safe manner, and harming Guardian with each successive transaction under the New Offering. Yet Defendants continued to represent Hughes, Guardian, and other Hughes entities just as they did before until Guardian's ultimate bankruptcy.

78.     Defendants enabled, and played a causal role, in Hughes' wrongdoing by violating the applicable Rules of Professional Conduct and by breaching their duty of undivided loyalty and other duties to Guardian.

79.     Guardian suffered damages from Defendants' wrongdoing well until 2023, including, through Hughes' continued use of Guardian as the Hughes' enterprises' piggy bank, and increased corporate and unsustainable obligations.

80.     Defendants' wrongful conduct reflects fraud, oppression, and malice towards Guardian. Despite many opportunities and its growing knowledge, Defendants failed to change their conduct and instead continued their wrongful conduct. Defendants' conduct was, at times, due to their extreme recklessness and intentional acts, and they should be punished and deterred from future wrongdoing.

## CLAIMS FOR RELIEF

### Count 1

### (Professional Negligence/Malpractice)

81.     Plaintiff realleges the material fact allegations above as if set forth here.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

13

82. Defendants, as Guardian's attorneys, owed it a duty to exercise reasonable and professional care in providing legal services, including advice and preparation in connection with the New Offering.

83. Defendants breached this duty by failing to exercise due diligence and allowing Guardian to maintain overstated asset values. These breaches include, but are not limited to those breaches listed below.

84. Negligent failure to protect Guardian in every possible way, including from insider misconduct and looting.

85. Negligent failure to protect Guardian from the liability which could flow from promulgating a false or misleading offering or marketing communication or transaction opinion to investors or potential investors.

86. Negligent failure to appropriately guide, counsel, advise, disclose information, and take all other appropriate steps to and for the benefit of Guardian in connection with the New Offering and entire spectrum of matters in which Defendants provided services and advice to Guardian.

87. Negligent failure to alert Guardian to problems and potential problems reasonably or readily apparent.

88. Negligent failure to consider and advise Guardian of any matters it overlooked and/or should have pursued or investigate to avoid prejudicing its interests.

89. Defendants owed Guardian further and expanded duties because Defendants had knowledge of facts that Hughes was using Defendants' services in furtherance of wrongdoing and because Defendants were the architects of the securities and offering transactions for Guardian, i.e., the New Offering.

90. Defendants' negligent acts were below the standard of care for comparable attorneys who practice in the community, especially attorneys, like Defendants, who are specialists in those services.

91. Defendants breach of duties was a substantial factor in causing damages to

Guardian, Defendants' breach of duties was the proximate cause of the damages sought in this action. There was a proximate causal connection between the breaches and the resulting injury.

92.     Guardian's damages to be proven at trial include being encumbered with obligations and liabilities, the misuse of its assets, the looting of its assets, and aggravating company insolvency.

93.     Had Defendants not breached their duties, Guardian would not have suffered these damages or the extent of these damages.

94.     Defendants were financially motivated to assist, conceal, and ignore wrongdoing and commit wrongdoing.

## Count 2

## (Breach of Fiduciary Duty)

95.     Plaintiff realleges the material fact allegations above as if set forth here.

96.     Defendants had an attorney-client relationship with Guardian which began no later than February 2020. Defendants were retained on a general representation, and the scope of the retention was very broad. Defendants continuously maintained this attorney-client relationship through at least March 2023.

97.     Defendants owed fiduciary duties to Guardian. Defendants were bound to act with the utmost good faith for the undivided benefit of and with undivided loyalty to Guardian.

98.     Defendants' duties included, but are not limited to, those duties listed below.

99.     To protect Guardian in every possible way, including from insider misconduct and looting.

100.    To protect Guardian from the liability which could flow from promulgating a false or misleading offering or marketing communication or transaction opinion to investors or potential investors.

101.    To appropriately guide, counsel, advise, disclose information, and take all other appropriate steps to and for the benefit of Guardian in connection with the New Offering and entire spectrum of matters in which Defendants provided services and advice to Guardian.

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

15

102.     To alert Guardian to problems and potential problems reasonably or readily apparent.

103.     To consider and advise Guardian of any matters it overlooked and/or should have pursued or investigate to avoid prejudicing its interests.

104.     To investigate, warn, protect, avoid conflicts, and avoid assisting in wrongdoing, all owing to Guardian.

105.     Defendants owed Guardian further and expanded duties because Defendants had knowledge of facts that Hughes was using Defendants' services in furtherance of wrongdoing and because Defendants were the architects of the securities and offering transactions for Guardian, i.e., the New Offering.

106.     Defendants breached their duties to Guardian by, among other things, the reasons listed below.

107.     Failing to protect Guardian in every possible way, including from insider misconduct and looting.

108.     Failing to protect Guardian from the liability which could flow from promulgating a false or misleading offering or marketing communication or transaction opinion to investors or potential investors.

109.     Failing to appropriately guide, counsel, advise, disclose information, and take all other appropriate steps to and for the benefit of Guardian in connection with the New Offering and entire spectrum of matters in which Defendants provided services and advice to Guardian

110.     Failing to alert Guardian to problems and potential problems reasonably or readily apparent.

111.     Failing to consider and advise Guardian of any matters it overlooked and/or should have pursued or investigate to avoid prejudicing its interests.

112.     Failing to stop Hughes' looting of and otherwise harming Guardian.

113.     Defendants violated applicable Rules of Professional Conduct. For example, Defendants never obtained informed consent and any enforceable written conflict waiver from

Guardian. Defendants wrongly looked out for Hughes and other Hughes' parties' interests, and itself, thereby failing to provide undivided loyalty to Guardian.

114. Defendants breach of duties was a substantial factor in causing damages to Guardian, Defendants' breach of duties was the proximate cause of the damages sought in this action. There was a proximate causal connection between the breaches and the resulting injury

115. Guardian's damages to be proven at trial include being encumbered with obligations and liabilities, the misuse of its assets, the looting of its assets, and aggravating company insolvency.

116. Had Defendants not breached their duties, Guardian would not have suffered these damages or the extent of these damages.

117. Defendants were financially motivated to assist, conceal, and ignore wrongdoing and commit wrongdoing.

## COUNT 3

### (Aiding and Abbetting Breach of Fiduciary Duty)

118. Plaintiff realleges the material fact allegations above as if set forth here.

119. Guardian's manager, Hughes, was a fiduciary to Guardian and Guardian's investors. As a fiduciary, Hughes owed a duty of loyalty to Guardian's investors.

120. As part of that duty of loyalty, Hughes had the duty to disclose conflicts of interest between its interests and the interests of Guardian and was prohibited from entering into transactions without adequate disclosure.

121. As part of that duty of loyalty, Hughes was prohibited from entering into contracts with Guardian that advance the business interests of Hughes over the business interests of Guardian.

122. Hughes failed to disclose its conflicts of interest to Guardian's investors.

123. Hughes entered into contracts with Guardian that advanced the business interests of Hughes over the interests of Guardian.

124. By virtue of their role as the architects of the New Offering and their other legal

services, Defendants substantially assisted Hughes' breaches of duty.

125. Through their conduct, Defendants breached their independent duties to their client, Guardian.

126. Defendants intentionally participated in Hughes' breach of fiduciary duty with knowledge of the object to be attained.

127. Defendants knew they had conflicts of interest and chose to ignore them (violating its fiduciary duties) and rendered advice and assistance as explained in detail previously (actions and inactions) that knowingly aided and abetted Hughes's wrongdoing and its harm upon Guardian.

128. Defendants' conduct was a substantial factor in causing harm to Guardian. Without Defendants' substantial assistance, the New Offering and other transactions would not have been implemented and carried out by Hughes, and the harm to Guardian would not have occurred.

129. Guardian's damages to be proven at trial include being encumbered with obligations and liabilities, the misuse of its assets, the looting of its assets, and aggravating company insolvency.

130. Had Defendants not breached their duties, Guardian would not have suffered these damages or the extent of these damages.

131. Defendants were financially motivated to assist, conceal, and ignore wrongdoing and commit wrongdoing.

## COUNT 4

### (Constructive Fraudulent Transfer)

### 11 .S.C. § 544 and NRS 112.180(1)(a) or other applicable state law

132. Plaintiff realleges the material fact allegations above as if set forth here.

133. Guardian made the transfers identified in Pargraphs 58—63 above ("Transfers").

134. Guardian did not receive reasonably equivalent value in exchange for the Transfers and was insolvent at the time of each of the Transfers.

135. The Transfers were for payment of legal fees, which were not earned.

136.    Defendants ignored wrongdoing and committed wrongdoing, were disloyal, and breached their duties to Guardian, including fiduciary, of care, of undivided loyalty, to act in good faith, and to avoid conflicts. Defendants failed to protect Guardian in every possible way, failed to comply with the Rules of Professional Conduct, including by practicing law in Nevada when they were not licensed in Nevada, and knowingly and intentionally harmed Guardian. Defendants joined and assisted Hughes and other Hughes entities in harming Guardian.

137.    Hughes perpetrated a fraudulent scheme through Guardian and other Hughes entities. At the time of each of the Transfers, because of the scheme and the claims of and obligations to Guardian's creditors and investors, Guardian: (a) was engaged (and was continuing to engage) in a business transaction for which Guardian's remaining property was unreasonably small; and (b) intended to incur or believed that it would incur debts beyond its ability to pay.

138.    Recovery is appropriate under Nevada law and 11 U.S.C. § 550, which provide that, to the extent that a transfer is avoided, Guardian is entitled to recover the transferred property, or the value thereof, from the initial transferee and any immediate or mediate transferee of such initial transferee.

139.    Guardian is entitled to recover the assets that were fraudulently transferred to Defendants.

**COUNT 5**

**(Preference Payments 11 U.S.C. § 547)**

140.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 27 as if fully set forth herein.

141.    On February 14, 2023, Guardian Fund, LLC made a payment of $21,226.53 to Laurence J. Pino. On February 16, 2023, Guardian Fund, LLC made a payment of $3,000 to Pino Law Group PLLC (collectively the "Preference Payments").

142.    The Preference Payments were made on account of antecedent debts.

143.    Guardian was insolvent at the time of the Preference Payments.

144.    The Preference Payments were made within 90 days of Guardian's petition date

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

of March 17, 2023.

145. The Preference Payments allowed Defendants to receive more than they would have in a Chapter 7 liquidation.

146. Recovery of the Preference Payments is appropriate under 11 U.S.C. § 550, which provides that, to the extent that a transfer is avoided under 11 U.S.C. § 547, Guardian is entitled to recover the transferred property, or the value thereof, from the initial transferee and any immediate or mediate transferee of such initial transferee.

147. Guardian is entitled to recover the Preference Payments that were made to Defendants.

<u>**PRAYER FOR RELIEF**</u>

Guardian prays for an order and judgment as follows:

1. For a judgment against Defendants for general and special damages;

2. For a judgment avoid the Transfers and Preference Payments under 11 U.S.C. §§ 547, 548, 544, 550, and NRS 112.180(1)(a) or other applicable state law

3. For reasonable attorney's fees and costs of suit incurred herein, and as special damages under FRCP 9(g) and Sandy Valley and its progeny, including all collection costs and post-judgment activities required of Guardian to enforce its judgment;

4. For prejudgment and post-judgment interest at the highest rate permitted by law; and

5. Any other relief this Court deems just and proper.

Dated April 11, 2025..

HARRIS LAW PRACTICE LLC

*/s/ Norma Guariglia*

_____

NORMA GUARIGLIA, ESQ.
*Counsel for Guardian Fund, LLC, Plaintiff*

**CERTIFICATE OF SERVICE**

On April 11, 2025, the foregoing document was served via ECF automated system to all parties registered with ECF in this case on the date and time I filed the document with the Court's ECF system.

I declare under penalty of perjury that the foregoing is true and correct.

Dated April 11, 2025.

/s/ Norma Guariglia

Norma Guariglia

HARRIS LAW PRACTICE LLC
850 E. PATRIOT BLVD.
SUITE F
RENO, NEVADA 89511
775 786 7600

21